UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

United States District Court
Southern District of Texas
FILED

JAN 3 1 2002

Michael N. Milby
Clerk of Court

| | | |
|---|---|---|
| MIRIAM MARTINEZ | § | |
| | § | |
| VS. | § | C.A. NO. B-01-095 |
| | § | |
| | § | Removed from the 404th |
| | § | District Court of Cameron |
| LOS FRESNOS CONSOLIDATED | § | County, Texas |
| INDEPENDENT SCHOOL DISTRICT | § | |

## DEFENDANT LOS FRESNOS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT

TO THE HONORABLE JUDGE OF SAID COURT:

COMES NOW Los Fresnos Consolidated Independent School District and files this Motion for Summary Judgment and would respectfully show as follows:

### I. PROCEDURAL BACKGROUND

1.      Plaintiff Miriam Martinez filed her Original Petition in state court on May 11, 2001. In her Original Petition, plaintiff alleged a claim pursuant to 42 U.S.C. §1983 alleging a violation of the First Amendment to the United States Constitution. Plaintiff further alleged a due process violation, as well as a conspiracy to violate the Texas Open Meetings Act and a claim for intentional infliction of emotional distress.

2.      On June 4, 2001, Defendant Los Fresnos Consolidated Independent School District filed their Original Answer in state court.

3.      Defendant Los Fresnos Consolidated Independent School District inadvertently filed a Second Original Answer on June 7, 2001.

4.      On June 7, 2001, Defendant Los Fresnos Consolidated Independent School District filed a Notice of Removal to Federal Court pursuant to 28 U.S.C. §§1331

and 1441.

5.     On June 28, 2001, Defendant Los Fresnos Consolidated Independent School District filed their Motion to Withdraw and Substitute Counsel, Certificate of Parties Financially Interested in the Outcome of Litigation, and their Original Federal Answer.

6.     The parties to this lawsuit filed their joint report of meeting of counsel and joint discovery/case management plan on July 11, 2001.

7.     On July 25, 2001, Defendant Los Fresnos Consolidated Independent School District filed its initial disclosures pursuant to Federal Rule of Civil Procedure 26.

8.     On August 15, 2001, all parties consented to this jurisdiction of United States Magistrate Judge John Wm. Black.

9.     Defendant Los Fresnos Consolidated Independent School District filed their First Supplemental Rule 26 Disclosures on August 13, 2001.

10.     On September 14, 2001, Plaintiff filed her Unopposed Motion for Leave to file her First Amended Original Complaint, and the same was granted on September 20, 2001.

11.     On September 28, 2001, Defendant Los Fresnos Consolidated Independent School District filed its Second Amended Answer.

## II.  STATEMENT OF THE CASE

12.     Plaintiff Miriam Martinez was employed as a bus driver with the transportation department of the Los Fresnos Consolidated Independent School District (hereinafter "Los Fresnos C.I.S.D"). Plaintiff had been employed with Los Fresnos C.I.S.D. since approximately 1988.

13.     On May 13, 1999, the Plaintiff was terminated from her position as a bus driver with Los Fresnos C.I.S.D.  Plaintiff claims she was terminated for exercising her First Amendment right to freedom of speech and political association.  Defendant contends the Plaintiff was terminated as a result of an incident that occurred on Saturday, May 1, 1999, during a student trip to Corpus Christi, Texas.  *See* Exhibit A, Memorandum from Fidela E. Hinojosa to Mariam Martinez dated May 13, 1999.

14.     Attached to the memorandum (attached hereto as Exhibit A) regarding the termination of the Plaintiff, was a termination recommendation form dated May 10, 1999, signed by one of Ms. Martinez's supervisor, Mr. Gonzalez, the Los Fresnos C.I.S.D. transportation director.  *See* Exhibit B, completed termination recommendation form dated May 10, 1999.  More specifically, the articulated reasons for Mr. Gonzalez' recommendation for the plaintiff's termination was listed as follows:

> "The employee's carelessness resulted in several incidents, striking a shoulder overhang breaking a bus window, drifting from her lane onto the grass area while exceeding the legal speed limit, while attempting to change lanes narrowing ness to hitting a pickup, and failing to relinquish the bus at the request of the sponsor. These incidents place the bus, students and sponsor in a hazardous situation." *See* Exhibit B.

15.     Mr. Gonzalez' decision to recommend the termination of the plaintiff came as a result of several witness statements.  One such statement came from the plaintiff's immediate supervisor Mr. Saul Bazaldu, the Los Fresnos C.I.S.D. transportation supervisor.  *See* Exhibit C, memorandum from Bazaldu to Gonzalez dated May 3, 1999.  Mr. Bazaldu indicated that the plaintiff damaged one of the bus windows, drove the bus out into an open field, swayed onto the shoulder of the roadway, almost hit another vehicle on the roadway, and endangered the lives of students and other persons on board the bus.  *See* Exhibit C.

16.     The decision to terminate the Plaintiff from her position as a bus driver was not a decision taken lightly by Los Fresnos C.I.S.D., and the plaintiff was advised in writing of her right to appeal the termination pursuant to the grievance procedure. *See* Exhibit D.

17.     As part of the basis for the District's decision to terminate the Plaintiff, administration relied on several witness statements.  One such witness statement was received from Rosalinda Rios. *See* Exhibit E, Witness Statement of Rosalinda Rios.  Ms. Rios stated that she witnessed Ms. Martinez pull onto the shoulder traveling at a  fast rate of speed and drifting on toward the caliche road. *See* Exhibit E.

18.     In addition, administration relied on a statement from Frank C. Cisneros, director of bands for Los Fresnos C.I.S.D.  Mr. Cisneros indicated that the bus was driven by the Plaintiff too close to a dumpster as they were exiting the parking lot of a Whataburger in Raymondville, and as a result, the bus hit the dumpster and a window broke shattering glass across the aisle of the bus which was occupied at the time by students. *See* Exhibit F.

19.     In addition, Mr. Cisneros stated that during the trip the bus suddenly drove onto the shoulder at full speed and then swerved back into the driving lane.  Upon inquiry by one of the sponsors, the plaintiff indicated she had a problem with her neck.  Mr. Cisneros further stated that there was a near collision when the plaintiff veered to the right and almost struck a vehicle.  Despite a request to allow someone else to drive the bus for the remainder of the trip, the Plaintiff refused to relinquish control. *See* Exhibit F.

20.     A statement was also provided by Remijio Garza regarding the May 1, 1999, incident involving the plaintiff. *See* Exhibit G, Witness Statement of Remijio

Garza. In his statement, Mr. Garza testified that he witnessed the Plaintiff veer the bus off the road and onto the shoulder for some period of time while the students were on board. He also noticed that the bus had a broken window. Mr. Garza stated that the sponsors were very concerned and tried to call the plaintiff's supervisor, Mr. Gonzalez, but were unable to reach him. *See* Exhibit G.

21.     The plaintiff appealed her termination through the grievance procedure, but was unsuccessful in regaining her position.

22.     Although the recommendation to terminate the plaintiff was made by Mr. Gonzalez after Mr. Bazaldu conducted an investigation and the plaintiff was provided an opportunity to respond, the final decision was that of the superintendent and then the personnel director, and ultimately the school board when the plaintiff appealed.

### III.  STANDARD OF REVIEW

23.     Fed.R.Civ.P. 56(c) provides that "summary judgment shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." The movant for summary judgment bears the initial burden of informing the Court of the basis for its motion and demonstrating that the absence of a genuine issue of material fact exists. Celotex Corp. v. Catrett, 106 S.Ct. 2548, 2553 (1986); Williams v. Adams, 836 F.2d 958, 960 (5th Cir. 1988). The movant's burden is "only [to] point out the absence of evidence supporting the nonmoving party's case." Shotak v. Tenneco Resins, Inc., 953 F.2d 909, 913 (5th Cir. 1992).

24.     Here, Defendant bears its summary judgment burden by establishing

through sworn deposition testimony the absence of evidence supporting Plaintiffs' case by showing that the Defendant Los Fresnos Consolidated Independent School District acted appropriately in all respects.

25.     Thus, the Plaintiff must set forth specific facts showing the existence of a genuine issue for trial. Celotex Corp., 106 S.Ct. at 2552; Anderson v. Liberty Lobby, Inc.,106 S.Ct. 2505, 2514 (1986); Topalian v. Ehrman, 954 F.2d 1125, 1131 (5th Cir. 1992).  When the movants have satisfied their initial burden, the nonmovant "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." Tubacex, Inc. v. M/V Risan, 45 F.3d 951, 954 (5th Cir. 1995).  The controverted evidence must be viewed in the light most favorable to the nonmovant and all reasonable doubts must be resolved against the moving party. Anderson, 106 S.Ct. at 2514.

26.     Summary judgment is mandated if the nonmovant fails to make a showing sufficient to establish the existence of an element essential to the case on which the non-movant bears the burden of proof at trial. Celotex Corp.,106 S.Ct. at 2552.  "In such situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id.

## IV.  ARGUMENTS AND AUTHORITIES

27.     The First Amendment protects speech by an employee commenting as a citizen on a matter of public concern. Connick v. Myers, 461 W.S. 138, 147, 103 S.Ct. 1684, 1690, 75 L.Ed.2d 708 (1983).

28.     To prevail on a First Amendment retaliation claim, the plaintiff must show

that (A) the speech was on a matter of public concern;  (B) the speech was a "substantial or motivating factor in the termination;" and (C) the defendant can escape liability by showing that it would have taken the same action in the absence of the protected conduct. Mt. Healthy Board of Education v. Doyle. 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *see also* Beattie v. Madison County School District, 254 F.3d 595, 601 (5th Cir. 2001); *citing* Harris v. Victoria Independent School District, 168 F.3d 216, 220 (5th Cir.), *cert. denied* 528 E.S. 1022, 120 S.Ct. 533, 145 L.Ed.2d 413 (1999).

29.    In other words, the plaintiff Miriam Martinez must show that she engaged in protected conduct and that it was a motivating factor in her discharge.  The burden then shifts to the Defendant to show by a preponderance of the evidence that they would have come to the same conclusion in the absence of the protected conduct.  Mt. Healthy City School District Board of Education, 429 U.S. at 287.  Defendant in the present case does not believe the plaintiff has met her initial burdens of demonstrating that her speech was on a matter of public concern, or a causal connection, i.e., that the speech motivated her discharge.

**A. The plaintiff's speech was not on a matter of public concern.**

30.    As stated previously, the First Amendment protects speech by an employee commenting as a citizen on a matter of public concern.  Connick, 461 U.S. at 147.  Whether an employee's speech addresses a matter of public concern must be determined by the content, form, and context of a given statement, as revealed by the whole record.  Id. at 147-48. Defendant asserts that the plaintiff has failed to show that when she called Channel 4, wrote a "letter" about having to pick up their paychecks an hour after they get out of work, or writing a "petition" about work hours she was

speaking on a matter of public concern. *See* Exhibit H, Excerpted deposition of Miriam

Martinez at 19:3-7; 25:4-14; 77:10-22; 78:12-25; 79: 1-24; 80:1-16.[1] . During each of

these incidents, the plaintiff was speaking or acting in her role as an employee bus driver,

during regular work hours and, consequently, her expression was not a matter of public

concern. Her complaints were about hours, checks being on time and one employee

getting more trips. Therefore, defendant argues plaintiff's speech and conduct was not

constitutionally protected.

**B.   The plaintiff fails to show that the speech was a "substantial or motivating factor" in the termination, or more specifically, fails to show a causal connection between the speech and the termination.**

31.   In the present case, the plaintiff claims she was terminated for exercising

her right to speak about concerns in the transportation department, and was a member of

a union. However, plaintiff admits that her "vocalizing" her discontent with the hours

many employees were receiving, and her contact with a television news station occurred

six months prior to her termination. *See* Exhibit H at 19:3-13. Plaintiff further admits

that no one, including Mr. Gonzalez, ever told her to stop voicing her opinion or to

discontinue her association with a union. *See* Exhibit H at 35:4-10; 81: 2-9; 82: 9-22.

The plaintiff offers no evidence, but rather asks the court to infer improper motive in her

termination simply because she belonged to a union, although she admits no one ever

tried to keep her from voicing her opinion or being a member of a union.

32.   Plaintiff alleges that the person she is complaining about in this lawsuit is

Mr. Gonzalez. Plaintiff claims he treated employees differently, but the employees who

got preferential treatment included both union and non-union members. *See* Exhibit H at

63: 5-25; 64: 9-15. The types of complaints the plaintiff made about Mr. Gonzalez

---

[1] Deposition testimony will be referenced in the following format - page: line.

*Defendant Los Fresnos' Motion for Summary Judgment*
*Civil Action B-01-095*
*Page 8*

including allowing certain people in the bus barn, which included both union and non-union members, and giving newer employees more hours, which also included both union and non-union members, and not wanting to make a Thanksgiving dinner for everyone, although she could not think of a reason for the difference in treatment, other than some were his friends. *See* Exhibit H at 23: 5-25; 24: 1-6; 33: 8-14; 34: 2-13; 63: 5-25; 64: 1-15. Plaintiff does admit, however, that when she told Mr. Gonzalez he should do a dinner for everyone, he agreed and did a dinner for everyone. *See* Exhibit H at 63: 5-25.

33.    Very important is the plaintiff's own admission that Mr. Gonzalez did not interfere with the plaintiff's ability to do her job, he never picked on her, he left her alone to work, and never said anything directly to her about anything. See Exhibit H at 62: 17-25; 82: 12-23. Mr. Gonzalez never threatened her, reduced her pay, demoted her, singled her out or attempted to intimidate her.

34. In the end, Mr. Gonzalez was only able to make the recommendation to terminate the plaintiff. He had no final decision making authority.

35.    Solely for arguments sake, even if the plaintiff is correct in her reasoning concerning Mr. Gonzalez and the reason for his recommendation, the final decision to terminate the plaintiff was made by Ms. Fidela Hinojosa, the personnel director for Los Fresnos C.I.S.D.   The plaintiff unequivocally states during her sworn deposition testimony that Ms. Hinojosa made the final decision to terminate her, that Ms. Hinojosa never retaliated against her or did anything "wrong to her," and that Ms. Hinojosa never yelled at her, or threatened her. *See* Exhibit H at 28: 3-5; 76: 18-25; 80: 21-25; 81: 1. In fact, plaintiff claims Ms. Hinojosa knew she was "writing petitions" but did not make any attempt to tell her to stop writing petitions, and in fact, plaintiff admits that Ms. Hinojosa

did not care because she never said anything. *See* Exhibit H at 81: 2-9. Because the plaintiff admitted Ms. Hinojosa did not have any ill motive, any allegations of illegal conduct on the part of Mr. Gonzalez are not imputed to Ms. Hinojosa because the ill will stopped with Mr. Gonzalez.[2]

36.     Although Ms. Hinojosa adopted the recommendation of Mr. Gonzalez, the recommendation exhibited no unconstitutional motive on its face.   The plaintiff has provided no evidence regarding how Ms. Hinojosa, the person the plaintiff claims terminated her, was made aware of Mr. Gonzalez alleged illegal motive. *See* Cabrol v. Town of Youngsville, 106 F.3d 101, 108 (5th Cir. 1997).

37.     While Ms. Hinojosa had some final decision making power, so did the superintendent when he approved Mr. Gonzalez recommendation and sent it on to Ms. Hinojosa. There has been absolutely no evidence whatsoever, in the form of documents or testimony, that Mr. Ruiz retaliated against the plaintiff or had any ill-will in approving the recommendation.   As stated previously in regards to Ms. Hinojosa, although the superintendent adopted the recommendation of Mr. Gonzalez, the recommendation exhibited no unconstitutional motive on its face.   Further, the plaintiff has provided no evidence regarding how the superintendent, the person who first approved the recommendation by Gonzalez, was made aware of Mr. Gonzalez motive or the plaintiff's political expressions. *See* Id.

38.     The plaintiff has not demonstrated that Mr. Gonzalez' recommendation was tainted by an illegal intent and that it had sufficient influence or leverage over the ultimate decision maker in this situation, which was Mr. Ruiz, followed by Ms. Hinojosa

---

[2] Defendant makes this argument for purposes of disposing of plaintiff's counter argument, but remains steadfast in its position that Mr. Gonzalez had no ill motive in recommending the termination of the plaintiff.

and ultimately the school board when the plaintiff appealed. *See* <u>Rios v. Rossotti</u>, 252 F.3d 375, 381-82 (5th Cir. 2001).

39.     The plaintiff appealed her termination through the school district and was not successful. Her first appeal was to Mr. Gonzalez, the transportation director. Mr. Gonzalez denied her appeal. The second level was to Ms. Fidela Hinojosa, which was also denied. The third level of the grievance procedure was to the school board, which also denied her appeal of termination.

40.     The ultimate decision was made by the school board, and unless the plaintiff can show the board had ill-motive, her claim can not survive. *See* <u>Beattie v. Madison County School District</u>, 254 F.3d 595 (5th Cir. 2001).

## C.  The defendant is not liable because it would have taken the same action in the absence of the protected conduct.

41.     Defendant would assert that even if the plaintiff's vocalization six months prior to her termination was a substantial or motivating factor in the recommendation, the defendant escapes liability because it would have taken the same action in the absence of the protected conduct. *See* <u>Mt. Healthy City School District Board of Education</u>, 429 U.S. at 287. The evidence suggests that the decision to fire the plaintiff was for justifiable and independent reasons including:  a broken window, exceeding the speed limit, traveling outside her lane and onto a shoulder, refusing to relinquish control of the bus, narrowly avoiding a collision by her erratic and careless driving, and most importantly, endangering the lives of students and sponsors. *See* <u>Exhibits A, B, C, E, F, G, and I</u>. Furthermore, there were independent witness statements which were taken into consideration by Mr. Gonzalez, Mr. Ruiz, Ms. Hinojosa and the school board. Each of these articulated reasons are permissible, legal and justifiable reasons for the defendant's

decision to terminate the plaintiff, and was done only after the plaintiff provided her own statement. *See* Exhibit I, Spanish and English version of Miriam Martinez' statement dated May 5, 1999.   The plaintiff admitted in her sworn deposition testimony that one of her main responsibilities was to keep the students safe, and she also had a responsibility to keep the bus safe.  See Exhibit H at 10:9-15; 11: 12-15.

42.      The plaintiff admits in her own statement regarding the May 1, 1999, incident that she allowed the bus to move onto the shoulder of the road. *See* Exhibit I. She further admits that she failed to notice the shed, and as a result hit the shed with the bus.  *See* Exhibit I. As a result the "window exploded into very small pieces." *See* Exhibit I.   Plaintiff admitted that she was asked to relinquish control of the bus, but did not because she no longer felt ill. *See* Exhibit I.  Basically, the plaintiff admits several of the reasons she was terminated.

43.      In her statement regarding the May 1, 1999, incident, (attached hereto as Exhibit I) the plaintiff **never** alleges she is being retaliated against by Mr. Gonzalez for exercising her First Amendment rights.   Rather, the plaintiff claims that "Mr. Cisneros already had it in for me because I had a problem some time back with him and my children and he never regretted having done what he did and since I forced him to apologize in front of Ms. Zamora, this Mr. Cisneros will never forgive me for." *See* Exhibit I.  The plaintiff explained in her deposition that Mr. Cisneros had to apologize to her after an incident involving her two children some time ago. *See* Exhibit H at 72: 15-25; 73: 25.  She believed this is what motivated Mr. Cisneros to write his statement and this is where the reason for her termination began.  The plaintiff further stated that she "asked him to please forgive me for what had happened the moment we got to Corpus,

but it seems like he did not hear what I told him." *See* <u>Exhibit I</u>.

## V. CONCLUSION

44.     The plaintiff, Miriam Martinez bases this lawsuit on her membership in a union she does not know the name of. *See* <u>Exhibit H</u> at 16: 4-10. Although Defendant does not believe the conduct engaged in by the plaintiff is constitutionally protected, it occurred six months prior to her termination. The termination was based on an incident which occurred on May 1, 1999, after an investigation by Mr. Balzadu and the review of several witness statements, including that of the plaintiff. *See* <u>Exhibit J</u>, Response of Mr. Gonzalez to Ms. Martinez' statement.   By her own admission, plaintiff admits that no one from the district ever attempted to discourage her from her so called "union activity," including Mr. Gonzalez and Ms. Hinojosa. The decision was made by administration and ultimately ratified by the school board in the appeal process. The plaintiff has offered no evidence, other than her own personal belief, that her termination was based upon her membership in a union and vocalization of her problems with the transportation department. The plaintiff has not met her burden.

45.     WHEREFORE, PREMISES CONSIDERED, Defendant Los Fresnos Consolidated Independent School District requests this Court grant their Motion for Summary Judgment, dismiss all of the claims of the Plaintiff against them, and enter a final judgment, and for such other and further relief to which they may be legally and justly entitled.

Respectfully submitted,

**McKINNEY & RODRIGUEZ-BARRERA**

**Professional Corporation**
615 N. Upper Broadway, Ste. 1280 (78477)
P.O. Box 2747
Corpus Christi, Texas  78403
(361) 879-0300
FAX: (361) 879-0303

By: _____
Phillip A. McKinney, Attorney in Charge
For Defendant Los Fresnos Consolidated
Independent School District
Federal I.D. 13867
State Bar No. 13723200
Angelica E. Rodriguez Barrera
Federal I.D. 27469
State Bar No. 24027279

## CERTIFICATE OF SERVICE

I certify that on January 3O, 2002, a complete and correct copy of the foregoing pleading was served on each party by delivery to the following attorneys of record in the manner indicated below:

VIA FACSIMILE AT:  (956) 702-9659
AND REGULAR MAIL
Mr. Michael Pruneda
The Pruneda Law Firm
P.O. Box T
Pharr, TX 78577

_____
Angelica E. Rodriguez-Barrera



# LOS **LF** CISD
# Fresnos

LOS FRESNOS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT

Eliseo Ruiz, Jr., Ph.D.
SUPERINTENDENT

*Received copied*
*in person by*
*Miriam Martinez*
*5/14/99 8:07 A.m.*
*for*

**VIA CERTIFIED MAIL:** ~~Z267 691 538~~ *A Texas Education Agency "Exemplary" District*

| | |
|---|---|
| **TO:** | Miriam Martinez, Bus Driver<br>Transportation Department |
| **FROM:** | Fidela E. Hinojosa<br>Personnel Director |
| **DATE:** | May 13, 1999 |
| **Re:** | TERMINATION OF EMPLOYMENT |

This is to notify you that you are being terminated from your position of BUS DRIVER with the Los Fresnos C.I.S.D. effective today.

The reason for your termination is due to incidents that occurred Saturday, May 1, 1999 during a student trip to Corpus Christi. (See Attachment)

Pursuant to Los Fresnos C.I.S.D. School Board Policy Manual, Policy DGBA and DGBA (Local) you have the right to file a Level I Grievance within 15 days of receipt of this letter. Copies of these policies are attached.

Also, attached is an Exit Report that needs to be completed by you and mailed back to us as soon as possible at the following address:

> Los Fresnos C.I.S.D.
> Personnel Dept.
> P.O. Box 309
> Los Fresnos, Tx 78566

Please call me if you have any questions and/or concerns regarding this termination.

I, MIRIAM MARTINEZ, hereby acknowledge receipt of this memorandum.

| | |
|---|---|
| _____ | _____ |
| Signature | Date |

LFCISD.000218

# FORM TO BE USED TO RECOMMEND TERMINATION OF ALL PERSONNEL EXCEPT PROFESSIONAL PERSONNEL

Name of person being recommended for termination: <u>Miriam Martinez</u>

Present Position: <u>Bus Driver</u>

Campus/Department: <u>Transportation</u>

I certify that I have personally informed <u>Miriam Martinez</u> that his/<u>her</u> performance is unsatisfactory (or see reason/s listed below) and that I am **recommending** that his/<u>her</u> employment with the district be terminated. Attached is a copy of the letter given by me to the employee and a copy of his/her last evaluation.

OTHER REASON/S:

<u>The employee carelessness resulted in several incidents,</u>

<u>striking a shelter overhang breaking a bus window, drifting</u>

<u>from her lane onto the grass area while exceeding the legal</u>

<u>speed limit, while attempting to change lanes narrowly missed</u>

hitting a pickup, and failing to relinquish the bus at the request of the sponsor. These incidents placed the bus, students and sponsors in a hazardous situation.

| | |
|---|---|
| _(signature)_ | _5-10-99_ |
| Supervisor's Signature | Date |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Approved: ( X )     Denied: ( )

| | |
|---|---|
| _(signature)_ | _5-13-99_ |
| Superintendent's Signature | Date |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Personnel Office will:

1) Mail a copy of this form to the terminated employee (Certified Mail)
2) Send a copy to the Supervisor
3) Place a copy with attachment in the employee's file

LFCISD.000222



**LOS FRESNOS CONSOLIDATED
INDEPENDENT SCHOOL DISTRICT**

*A Texas Education Agency "Exemplary" School District*

## TRANSPORTATION DEPARTMENT

To:     Mr. Guadalupe Gonzalez
           Transportation Director
From:  Mr. Saul Bazaldu
           Transportation Supervisor
Date:   May 3, 1999
Re:     Report on driver

Saturday morning 5/1/99, two buses and one truck departed early in the morning, 5:30 am, for the Southcoast Music Festival held in Corpus Christi, Texas. These bus's were driven by Ms. Rosalinda Rios and Ms. Mirium Martinez. The truck was driven by Mr. Remigio Garza. When arriving at Raymondville, Texas, they all stopped at the local Whataburger to pick up food already called in. Bus # 9 was driven by Ms. Martinez and she manuevered the bus through a tight entrance. After picking up their food she backed up the bus and accidently hit a garbage bin, damaging one of the windows. She then drove the bus straight out and into an open field and out onto the highway.

When out on the highway heading towards Corpus Christi, she was swaying onto the shoulder. She was on the shoulder until the Band Director yelled at her and she managed to get back in the lane. The whole time she was on the highway she kept swaying back and forth. Ms. Martinez did mention to Mr. Garza she was taking medication for pain she was experiencing to her neck. Later that day she mentioned to Mr.Garza she had ½ a tank of fuel on her bus and he advised her to fuel up before leaving back home. Ms. Martinez did not fuel the bus, but if she had to, Mr. Garza advised her not to fuel the bus with students on board. She said if she had to fuel the bus, she would do it with students on board, because it was always done this way.

During the trip back home, she started to sway again, to the shoulder and toward the passing lane. Mr. Garza offered to drive the bus and the Band Director offered to drive the truck, but she refused, she said she was okay. Mr. Garza was behind her in the truck, when he noticed she was trying to pass a truck on the highway. She decided to change back to her lane, when she realized she couldn't pass and almost hit the rear end of the truck.

Mr. Gonzalez, backing a school bus is not permissible, especially without someone guiding the bus safely, in a tight parking area. She could have asked the other drivers to help her back safely. She could have also avoided driving the bus through an open field. She endangered the lives of students on the bus by traveling through a field not knowing what condition it was in and without authorization (private property). She also, endangered the lives of the students and everyone else on board, by taking medication, falling asleep at the wheel and refusing someone's help in driving when it was offered to her.


Bus Driver:     Miriam Martinez

Bus #:         9

Band Director:  Mr. Frank Cisneros

School:        Los Fresnos High School

LFCISD.000240

**LOS FRESNOS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT**
**P.O. BOX 309/600 N. MESQUITE ST.**
**LOS FRESNOS, TX 78566**

### EMPLOYEE COMPLAINT FORM:   LEVEL ONE

Any employee filing a complaint must fill out this form completely and submit it to his or her principal or immediate supervisor.  All complaints will be processed in accordance with DGBA (LEGAL) and (LOCAL) or any exceptions outlined therein.

1.  Name   *MIRIAM MARTINEZ*

2.  Position/campus   *Bus Driver / Transportation.*

3.  Please state the date of the event or series of events causing the complaint.

    *Sabado 1° de Mayo de 1999*

4.  Please state your complaint, including the individual harm alleged.

    *Yo fui despedida injustificadamente, sin rasón y sin suspención previa, respondiendo a problemas privados con el Supervisor, el Sr. L. Gonzalez*

5.  Please state specific facts of which you are aware to support your complaint (list in detail).

    *Nunca me salí de la carretera en ningún momento. Nunca exedí el limite de velocidad. Nunca tuve contacto asico con la pickup en mención. Y nunca hubo una situacion de peligro para nadie.*

6.  Please state the remedy you seek for this complaint.

    *Ser restaurada a mi Trabajo inmediatamente y pago de los dias perdidos.*


*Miriam Martinez*
Employee signature

*5/18/99*
Date submitted

*Recd. ___ 5/24/99*

LFCISD.000216

1

## LOS FRESNOS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT
### P. O. BOX 309/600 N. MESQUITE ST.
### LOS FRESNOS, TX 78566

## EMPLOYEE COMPLAINT FORM: LEVEL ONE

Any employee filing a complaint must fill out this form completely and submit it to his or her principal or immediate supervisor. All complaints will be processed in accordance with DGBA (LEGAL) AND (LOCAL) or any exceptions outlined therein.

1.   Name          Miriam Martinez

2.   Position/campus          Bus Driver/Transportation.

3.   Please state the date of the event or series of events causing the complaint.

     Saturday 1st day of May, 1999.

4.   Please state your complaint, including the individual harm alleged.

     I was unjustifiably dismissed, without reason and without previous suspension, responding to personal problems with the supervisor, Mr. L. Gonzalez.

5.   Please state specific facts of which you are aware to support your complaint (list in detail).

     I never drove off of the road at any time.
     I never exceeded the speed limit. I never had physical contact with the pick-up mentioned.
     And there was never a possible danger for anyone.

6.   Please state the remedy you seek for this complaint.

     To be immediately returned to my employment and payment of the days missed.


 _Miriam Martinez_____          ___5/18/99_____
Employee signature                        Date submitted


_Rec'd. S. Stamps 5/24/99_


LFCISD.000217

_____

**T R A N S L A T I O N**

To Whom it mays Concer

5-7-98

Mariam Martinez was driving in from
of Rosolinda Rios. And in a split second
I saw the her bus going down to the
calicle on the right side And pull over to
the shoulder very fast and drove on the shoulder
about 50 ft. I pull over to see if she was
going to stop and she drove away. I called
her ~~the~~ the radio but couldn't get a hold
of her.

Rosolinda Rios

LFCISD.000226

# MEMO

TO:        Dr. Eliseo Ruiz, Superintendent of Schools
FROM:   Frank C. Cisneros, Director of Bands
DATE:    May 7, 1999
RE:         <u>**BUS   INCIDENT   REPORT**</u>

As requested this is a narrative of the oral report given to Dr. Ruiz on Monday, April 3, 1999.

The incident occurred on a bus trip taken by the High School symphonic band to Corpus Christi on Saturday, May 1, 1999.  The report is in two parts, the first involves the bus driver on a bus chaperoned by Mr. Frank Cisneros and John Randolph.

A.  The first indication of problems was when the bus was driven too close to a dumpster as we were exiting the parking lot of the Whataburger restaurant in Raymondville.

The bus hit the dumpster and a window broke shattering glass across the isle to the opposite seat.

The second  incident was in route when the bus suddenly drove on the shoulder at full speed.  I asked the driver to slow down and get back to the driving lane.  She did not respond.  The driver continued to drive between the shoulder and the right lane.  The driver was told to move to her left and was asked what was wrong.  She responded that she had a problem with her neck.  The rest of the trip to Corpus was without incident.

B.  After the competition the bus driver and the instrument truck was sent back to Los Fresnos. The bus was chaperoned by Mr. Bill Bennett.

Mr. Bennett reports that another incident occurred around Kingsville.
The bus was on the left lane and veered to the right where there was a van.  The driver did not notice the van and a collision almost occurred.

Mr. Bennett who had witnessed the previous incident because he was on the second bus confronted the driver and asked her to let the truck driver continue the trip driving the bus. She did not agree saying that she was all right.  Mr. Bennett and truck driver tried to contact Mr. Gonzalez but was unsuccessful.

The driver continued to drive to Los Fresnos at a reduced speed of about 45 miles per hour and arrived  without  further  incident.

LFCISD.000227

On Saturday May 1, 1999 I was
scheduled for a trip to Corpus Christy
I was driving the truck and two buses
were going along. Bus #8 and bus #9.
Before we left I was told to go in
between the two buses Bus #9 was
going in front of me. As we were
heading to Corpus I noticed bus #9
was swaying. As we entered Raymondu
we stopped at Whataburger to pick up
breakfast for the students. We parke
in the back when we were about to
leave I noticed bus #9 wanted to ma
a sharp turn. She had difficulty
trying to get out. Finally bus #9
backed up and then bus #9 went
straight down to an open field, and
then bus #9 went back to the stree
Back on the road heading to our
destination. At that time I had
no idea bus #9 had broken a windo
It was until later in Corpus Chris
that I saw bus #9 with a brok
window. As we left Whataburger at
30 to 40 minutes on the road I noti

On Saturday May 1, 1999 I was scheduled for a trip to Corpus Christy. I was driving the truck and two buses were going along. Bus #8 and bus #9. Before we left I was told to go in between the two buses Bus #9 was going in front of me. As we were heading to Corpus I noticed bus #9 was swaying. As we entered Raymondville we stoped at Whataburger to pick up breakfast for the students. We parked in the back when we were about to leave I noticed bus #9 wanted to make a sharp turn. She had difficulty trying to get out. Finally bus #9 backed up and then bus #9 went straight down to an open field, and then bus #9 went back to the street. Back on the road heading to our destination. At that time I had no idea bus #9 had broken a window. It was until later in Corpus Christy that I saw bus #9 with a broken window. As we left Whataburger about 30 to 40 minutes on the road I noticed

LFCISD.000228

bus #9 swaying. Bus #9 continued doing the same thing. It got into the point that bus #9 was off the road for several feet. Finally bus #9 slowly got back to the lane. As we were still heading towards Corpus bus #9 was still doing the same thing. This means that bus #9 was still swaying. When we arrived in Corpus one of the directors asked me to park the truck in the back of the building. When I was moving the truck back It was there then when I saw bus #9 with a broken window. When I finished parking the truck and checking the truck. I went to bus #8 I asked the driver if she saw what had happened. She said yes the one of the directors had told her to call bus #9 to see what was going on. Bus #8 tried to call her on the radio to find out what was wrong, but the radios were not on the same station. I told bus #8 if she had noticed the broken window. She said what window. Then I pointed to bus #9 to show her the broken window. She was surprised what

LFCISD.000229

had happened. I left bus #8 and
headed to bus 9 to see what had happened.
As I was walking towards the bus I
asked one of the students what had
happened to the window He replied that
she had broken the window as she was
trying to get out of Whataburger. When
I got to bus #9 I asked her why she
went off the road. She said she had a
pain on her neck. She said she was trying
to massage it to see if she could fix it.
Then I went to bus #8 again and then
bus #8 asked me what had happened. I
told her what she had said to me. Then
bus #8 went and parked behind bus #9.
It was their when she came to bus #8
Bus #8 asked bus #9 what was going on
and she told her the same thing that she
told me. Bus #9 told us that the
director had yelled at her when she

LFCISD.000230

went off the road. She told him that
every thing was okay. She told us that
her neck was still hurting. I asked her
if she wanted to go to a near by store
to buy some aspiren. She told us that
she had already taken 3 pills for pain

At 11:15 A.m. the director came and told us that one bus was staying and the other bus and truck were heading home. At that point I asked the ladies how much fuel they had. They both replied with half a tank. I told them since one of us is staying you might need to refill for fuel. Then I asked them remember when you go to refill for fuel. Leave the students some place else and then go refill. As soon as you finish putting fuel go back and pick up the students. Bus #9 replied why. I said you are not aloud to put fuel with students aboard. Both drivers replied that they have put fuel with students aboard. At 11:35 A.m. the director came and told us that bus #9 was to go back with the truck, and bus #8 to stay their. After we ate the director told us which students were going back home. One of the band directors told me that we were going to stop at Kingsville in case the students needed to go to the restroom. As we left Corpus Christy as usual I was in back of bus #9.

LFCISD.000231

We had driven already from 30 to 40 minutes
when bus # 9 tries to pass a truck as
she was passing the truck I guess she
must have thought she had already
passed the truck. She then was going
back to the right lane but little did
she know she was about to hit the truck.
I don't know if the students warned
her or she saw the truck on the view
mirror. Quickly she moved back to the
left lane. I went forward behind the
truck and I honked my horn to get his
attention and then the truck noticed
something was going wrong. So he moved
out to the shoulder and then he gave me
the right away. Then I went on forward
to catch up with bus 9. Then again
she still was on the left lane finally
she went back to the right lane. After
that she continued to sway side by side.
Then I saw bus # 9 exiting to a
Convient store. When we came to a
complete stop. The band director came
straight to me. He asked me how was
her driving. I responded that she was
not doing a good Job. He then asked me

What can we do. I told him that we can call Mr. Gonzalez for an advice to what to do in this matter. He said okay. So we went to call Mr. Gonzalez and we couldn't get a hold of him. Then I asked the director that I was going to ask her if she wanted me to drive the bus, but then again I told the director that I didn't know if she could drive the truck. Then he replied that if she couldn't drive the truck that I would drive it. For the safety of the students. So I went into the bus and asked her if something was wrong with her. She said that nothing was wrong with her that she was fine. I asked her if she wanted me to drive the bus. She said No, No I am okay. Then I asked her again I'll take the bus and the director will take the truck. So you could rest. She refused again by saying she was okay. That nothing was wrong with her. Then I told her the students and the director were worried about your driving. She replied saying that it was only the wind pushing the bus. Then I told her

LFCISD.000233

that the director had said that he saw her eyes like if she was falling asleep. But she said nothing was wrong with her that she was okay. Then I turn around and told the director that I offer to drive the bus twice but she refused. Then I told him that we are going on ahead for the next 30 to 40 minutes if for any reason you are not satisfied with her driving you ask her to stop the bus and I will come and take the bus myself. For the safety of the children. For the next 30 minutes she was doing very well, but then again she was swaying again until we got back home to Las Fresnos. But the director did not stop her.

Remigio Garza

LFCISD.000234

1

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MIRIAM MARTINEZ            )
                          {   C.A. No. B-01-095
VS.                        )
                          {   Removed from the 404th
LOS FRESNOS CONSOLIDATED   )   District Court of
INDEPENDENT SCHOOL DISTRICT {   Cameron County, Texas

*****************************************************

ORAL DEPOSITION OF

MIRIAM MARTINEZ

NOVEMBER 30, 2001

*****************************************************

    ORAL DEPOSITION of MIRIAM MARTINEZ, produced as a witness

at the instance of the Defendant and duly sworn, was taken in

the above-styled and numbered cause on the 30th day of

November, 2001, from 10:27 a.m. to 1:51 p.m., before DINA

RAMIREZ, CSR in and for the State of Texas, reported by oral

stenography at the offices of James P. Grissom, 2408 North

Conway, Mission, Hidalgo County, Texas, pursuant to the

Federal Rules of Civil Procedure and the provisions stated on

the record or attached hereto.

COPY

**ESQUIRE DEPOSITION SERVICES**

1      A    Well, drive the bus and take care of the children,

2  bring them from school and then take them back to their house

3  safely in the afternoons.

4      Q    Okay.  Did you have any responsibilities in regards

5  to the bus itself?

6      A    Yes.  We had to check the oil, the water, everything

7  that corresponds to it, the lights, the brakes, the seats,

8  have it clean, maintain it clean.

9      Q    Okay.  When you were operating a bus, whether it was

10  with children or without children, did you have a

11  responsibility to keep that bus safe?

12      A    What do you mean, "safe"?

13      Q    To not damage it, to not drive it improperly, to not

14  vandalize it.

15      A    Well, yes, correct.  We had to treat it well, yes.

16      Q    When you were operating a bus, what rules or

17  regulations or laws governed you?

18      A    You mean driving the bus, or how?

19      Q    Yes, ma'am.

20      A    Well, there was a lot of rules.

21      Q    And --

22      A    Oh.  There was -- we had to -- as far as driving, we

23  had to check the rearview mirrors, the one -- the one in the

24  middle, both on the sides.  We had to check as to when we

25  would pick up and drop off children.

**ESQUIRE DEPOSITION SERVICES**

1    Q    That was probably the most open-ended question I
2  ever asked.  Let me -- let me get more specific.  Were there a
3  group of laws?  For example, the Texas Department of
4  Transportation has regular motor vehicle laws.  Were there any
5  laws specifically governing bus drivers?

6    A    To be a bus driver, we have to pass the CDL exam,
7  that's the main one, and then, afterwards, go to certified
8  classes.

9    Q    Okay.

10    A    To be able to drive the big bus, we also had to have
11  that certification.

12    Q    Okay.  Okay.  In your responsibilities, where would
13  you categorize your responsibility to keep the students safe?

14    A    How would I categorize it?  The maximum one.  I
15  always tried to have them very safe.

16    Q    Okay.  During your time as a bus driver, whether it
17  was the nine years that that was your only job or during the
18  period when you were both a bus driver and a cafeteria worker,
19  were you ever reprimanded by any of your supervisors for your
20  performance as a bus driver?

21    A    Reprimanded in what manner?

22    Q    For failing to follow a rule or exceeding a speed
23  limit, getting in an accident, anything like that.

24    A    No, never.

25    Q    Okay.  Is there a -- is there a procedure for a bus

1     Q    Did you ever hold a position with the union besides

2 just a member?

3     A    I was just a member.

4     Q    And what was the exact name of the union?

5     A    I don't know.  Since it was a new union, I --

6 truthfully, I don't remember.

7     Q    How long was it -- or how long had it been new, how

8 long had it been in existence?

9     A    When I started with this problem, it must've been

10 for one year.  It had one year.

11     Q    Did you receive literature from your union?

12     A    No.

13     Q    Did you go to meetings?

14     A    I would.

15     Q    And when were the meetings?

16     A    Not frequent.  It was every once in a while.  They

17 weren't frequent.

18     Q    Okay.  Can you give me a better idea of what "not so

19 frequent" means?

20     A    Well, we thought that it could be once a month, but

21 sometimes two or three months would go by and there was no

22 meeting.

23     Q    Okay.  And did you always attend the meetings when

24 they did happen?

25     A    Yes.

1    he started placing new people in positions that were

2    supposedly saved for those who had more seniority.

3        Q    Okay.  And -- I'm sorry.  Go ahead.

4        A    So, that's when I called Channel 4 and I called them

5    over so that he could visit us so that they could shed light

6    out there so that everyone could see what they were doing to

7    us.

8        Q    Okay.  When was that?

9        A    It was like in November of '98, around there.

10        Q    Okay.  So, it was -- November, December, January,

11    February, March, April, May.  It was six months before the

12    May, '99, incident, correct?

13        A    Yes, more or less.

14        Q    Okay.  In that occasion where you invited Channel 4,

15    had you ever contacted the media before?

16        A    No.

17        Q    Okay.  So, this was the first time?

18        A    Yes.

19        Q    Okay.  Were there any times after that?

20        A    No.

21        Q    Okay.  Okay.  Now, you told me -- and what you told

22    me is the retaliation part.  That's retaliation, that you're

23    saying he cut hours, he gave other people, new people the

24    places and stuff.  That's -- that's kind of retaliation.

25    That's the idea of it.

1  all.

2       Q    Okay.  So, they never -- they never cut your pay

3  rate?

4       A    Cut the salary?  In other words --

5       Q    Lowered your pay rate.

6       A    Well, the salary, they wouldn't reduce my salary.

7  What they would do is that they wouldn't give me enough hours.

8       Q    But they were doing that to all the other employees,

9  too, correct?

10      A    Yes.  The only thing there was that they would give

11 preference as to one group over another.

12      Q    Okay.  Which group got preference?

13      A    Well, almost always those that would get there in

14 the -- in the end.

15      Q    Okay.  The newer employees got more hours?

16      A    Right.

17      Q    Okay.  Were any of those employees members of the

18 union?

19      A    Hardly, no.

20      Q    Okay.  Were there any?

21      A    I'd have to say one or two or three, that's it.

22 Very little.

23      Q    And how big a group are we talking about?

24      A    The union ones?

25      Q    No, the ones that got preferential treatment.

1    A    I'd have to say I can't say the exact number.

2    Q    Understood.  But the best guess?

3    A    I'd say around ten.

4    Q    Okay.  So, maybe between one and three out of those

5    ten were members of the union?

6    A    More or less.

7    Q    Okay.

8    A    (By the Interpreter)  I wrote a letter with all

9    these, with all these things that we wanted, about the hours,

10   about them reducing our hours and not giving us enough trips.

11          (In English)  I make a letter.

12          (By the Interpreter)  I made a letter and about 20

13   drivers signed it.

14   Q    Okay.  Would that be called a petition?

15   A    Like a petition.

16   Q    Okay.  And when was that?

17   A    I don't remember, but it was before that this

18   problem of mine happened.

19   Q    In '98 or '99?

20   A    After -- towards the end of '98/beginning of '99,

21   after Channel 4 went there, more or less.

22   Q    Okay.

23   A    And Gonzalez did not like that letter.

24   Q    Okay.  Do you think that's why you were fired?

25   A    Well, for that reason, and for the reason that I

1  always tried to talk and -- and say what -- expose, you know,

2  things that are wrong, and for talking and, yes, sending those

3  letters.  That's why I think he fired me.

4      Q    And do you think that -- when, when would you speak

5  out?

6      A    Well, when we had sometimes our meetings.

7      Q    Okay.  Outside of the union meetings --

8      A    No, in the meetings, the in-service that we had with

9  the supervisors.

10     Q    Okay.  And did other employees speak out, as well?

11     A    Yes, the same.  A group of us were always talking

12 about the same thing.

13     Q    Okay.  And how many people signed that petition?

14     A    It was around 23 or 25, more or less.

15     Q    Okay.  And out of those 23 or 25 people that signed

16 it, what, if anything, negative happened to them?

17     A    Well, one of them -- well, not just one of them, but

18 three of the ones that did that, they also had to leave

19 because they were making their lives miserable there.  They

20 were deducting hours from them.  They wouldn't give them any

21 trips.

22     Q    And who were those three people?

23     A    Well, three of the drivers that -- three of us

24 drivers of the drivers that were working there.

25     Q    Okay.  And can you tell me the names of those three

1  but she would hold a title that was after the superintendent,

2  Mr. Ruiz.

3      Q    Okay.  Did Ms. Hinojosa retaliate against you in

4  some way?

5      A    No, not her.

6      Q    Okay.  In your petition, you talk about -- and if

7  you'd like to see this, you're more than welcome to see it.

8  So that you're not speaking from recollection, if you want to

9  look at it I can give it to you.  Would you like a copy of

10  your petition?

11      A    Okay.

12      Q    You might have it.

13      A    Is it this one?

14      Q    Is that it?  Mr. Grissom made a copy of mine this

15  morning.

16      A    (In English)  Plaintiff's Original Petition.  I

17  think it's the same.  No?

18      Q    No, it's the first amended.

19      A    (In English)  Oh, okay.

20          MS. BARRERA:  You want to make sure that's a

21  complete copy so that I can ask your clients some questions

22  about it?  Here's another copy.  This is Mr. Grissom's copy

23  right here.

24      Q    (Ms. Barrera)  Here, you take this one and I'm going

25  to swipe this one.  If you turn to the second page, if you'll

1    A    One of the names was Teresa Morua.

2    Q    Do you know how to spell that?

3    A    (In English)  Morua is M-O-R-U-A.

4         MS. BARRERA:  As much for my benefit as yours.

5         COURT REPORTER:  Thank you.

6    A    The other one was Miriam Vara.  And, Martinez, I

7  don't remember his or her last name -- his.  He.

8    Q    (Ms. Barrera)  Okay.  And why did they get to go

9  through the front door?

10    A    I don't know.

11    Q    Were they friends with Mr. Gonzalez?

12    A    Well, maybe so.  And those were the things that we

13  didn't like, why they let somebody do some things and us they

14  wouldn't.

15    Q    Okay.  Tell me about punching out.  What is the rule

16  about punching out?

17    A    Well, each and every one of us had to punch out 15

18  minutes early before the bus leaving; and, then, when we would

19  get back, 15 minutes afterwards so that we could clean the

20  bus.

21    Q    Okay.  Tell me what the problem was dealing with

22  punching out.

23    A    Well, the problem was that some people would come

24  and punch in and they still had half an hour.

25    Q    So, they were getting more time?

1    A    Well, yes.

2    Q    Who were those people, can you give me their names?

3    A    One of them had the last name of Garcia.  It's

4 because a lot of the people we knew them by their last name

5 and not by their first name.

6    Q    That's okay.  That's okay.  Okay.  Why did those

7 people, Garcia and whoever else, why did they get to punch in

8 early, do you know?

9    A    For more money.

10    Q    Do you know, why -- why didn't Mr. Gonzalez get

11 after them?

12    A    No.  They're groups of people who would be -- would

13 become great friends with the boss.  That's what I think.

14    Q    Okay.  Okay.  I'm going to talk to you a little bit

15 now about the more specific claims in your lawsuit.  The First

16 Amendment to the Constitution of the United States of America,

17 do you know what the First Amendment is?

18    A    I don't remember it.

19    Q    Okay.  The First Amendment to the Constitution gives

20 you your right to speak out freely, to associate or not

21 associate with any political group.  It is what gives you your

22 right, literally, to be an individual, to not be oppressed or

23 treated badly because you choose your own course.  Okay?  What

24 did the district do through its employees or its agents that

25 did not allow you to speak freely?

1    A    What is it that they did?  Well, what I think that

2  they did was to get me out, because they didn't want me to

3  talk.  So, they got me out.

4    Q    Before they terminated you, had they done anything

5  to try to keep you from voicing your -- your opinion?

6    A    For me not to talk?  They never told me anything.

7    Q    Okay.  What about in terms of being able to be a

8  member of the union?  Okay?  Did they try to keep you from

9  being a member of the union somehow?

10    A    No.

11    Q    Okay.  How does one attain tenure rights as a bus

12  driver?

13              INTERPRETER:  Pardon me?

14              MS. BARRERA:  Tenure rights.

15              INTERPRETER:  Okay.  Tend or ten?

16              MS. BARRERA:  Tenure, T-E-N-U-R-E.

17              INTERPRETER:  Tenure?  Okay.  Hmm.  Can you

18  think of a synonym for that word, Counsel?

19              MS. BARRERA:  It's a pretty technical term

20  that's mostly used with teachers or those who have --

21    A    I don't understand what you're trying to ask me.

22    Q    (Ms. Barrera)  Okay.  Can you turn the page -- or,

23  no.  Let me see.  Is there a Section III?

24    A    Uh-huh.

25    Q    Okay.  The very last part of it, part of what is

**ESQUIRE DEPOSITION SERVICES**

1     A     (In English)  Yeah.

2          (By the Interpreter)  But I couldn't open it.  I

3    could not open it because it was hard.  In other words, that

4    was not my bus.  I'm not used to those type of busses, and I

5    asked him for that favor and he said, "No, that's your

6    business.  You have -- you have to check it."

7     Q     So, he just didn't help you?

8     A     No.

9     Q     Okay.  Again, I'm trying to find out how your work

10   was scrutinized.  Can you -- let me -- let me try it this way.

11   Can you tell me if there's anything Mr. Gonzalez looked at in

12   regards to your work performance that he didn't do to the

13   other people?

14   A     Well, to start with, the hours that he wouldn't give

15   me.  I had the seniority there and he wouldn't treat me as

16   such.

17   Q     Did he ever interfere with your ability to do your

18   job when you were working?

19   A     Not that I can remember.

20   Q     Did he ever pick on you?

21   A     No, no.  As far as fighting, telling me something

22   directly, no.

23   Q     Did he leave you alone to do your job?

24   A     Yes, I would do my job.  As far as me doing my job

25   at the bus, he wouldn't intervene.

**ESQUIRE DEPOSITION SERVICES**

1     Q    Were you happy there working?

2     A    Well, until he got there.

3     Q    And what -- okay.  Okay.

4     A    Let me explain this to you.  Look --

5     Q    Go ahead.

6     A    During Thanksgiving, we would always do a dinner for

7 all of us.

8     Q    Okay.

9     A    And during that Thanksgiving, he only wanted to do a

10 dinner for the group of people that he had during the

11 afternoons for pre-K.  So, then I told him no.  I said, "We do

12 a dinner for everyone here or we don't do a dinner."  He got

13 mad, he didn't like that, but he did do the dinner for all.

14 He would do things like that all the time that I didn't like,

15 I didn't see them right.

16     Q    And who were those -- who were those drivers in the

17 afternoon that did pre-K?

18     A    Well, there were several of them.  It must've been

19 eight or ten.  I don't remember how many there were.

20     Q    Why did he want to do something for them and not

21 everybody?

22     A    I don't know.  He only wanted a little group, that's

23 all.

24     Q    Were they his friends?

25     A    Oh, yes.

**ESQUIRE DEPOSITION SERVICES**

1    Q    And you -- can you think of any reason that he would

2    treat them differently than the rest of you?

3    A    I don't know.  Sometimes I think -- I don't know

4    what to tell you.

5    Q    Just what --

6    A    He had more relationship, better relationship with

7    them, or these people were always there, those pre-K people

8    that -- that he gave them more hours.

9    Q    So, that's the same group we were talking about

10   earlier?

11   A    (In English)  Yes.  Yes, the same group.

12        (By the Interpreter)  The same group.

13   Q    And that was maybe one to three of them were union

14   members, that group?

15   A    Yes, more or less.

16   Q    Okay.  I want to look at the admissions, the request

17   for admissions.  Okay?  I want to ask you about September of

18   1989.  That was a long time ago.  Do you remember being in a

19   bus accident?

20   A    No.  I've never been in an accident.

21   Q    Okay.  Do you --

22        MS. BARRERA:  I want to have this marked.

23        (Exhibit 4 marked.)

24   Q    (Ms. Barrera)  I'm going to show you what's been

25   marked as Deposition Exhibit No. 4.  This is a memorandum

**ESQUIRE DEPOSITION SERVICES**

1    MS. BARRERA:  We can go off the record.

2    (Off the record from 1:18 p.m. to 1:23 p.m.)

3    Q    (Ms. Barrera)  Okay.  In regards to Deposition

4  Exhibits No. 8 and No. 9, 9 being your handwritten statement

5  and 8 being the typed statement, were there any

6  mistranslations in there?

7    A    (By the Interpreter)  No, it's right.  The only

8  thing would maybe be that it says here that I massaged my

9  neck --

10    (In English)  My neck toward the left, to the left.

11  Okay.  Well, I don't know that --

12    (By the Interpreter)  I don't know.  What I tried to

13  do here was to straighten out myself right here.  I don't know

14  what the difference is.  That's all.

15    Q    Okay.  My question is really limited to this

16  paragraph here.  You state that you believe he already had it

17  in for you and that you made him apologize.  What was that

18  about?

19    A    In '95, I went with a lot of them to -- it was a

20  band and there was a lot of them, to Lyford, to a game in

21  Lyford, and two of my girls were in the band and there was a

22  fight that broke out between the girls in the band and my two

23  girls, they were fighting.  I didn't know anything about it

24  until one of the drivers told me, "Miriam, your girls, they're

25  getting them, taking them out from the band because they were

1   fighting." So, I went to talk to Cisneros to see what was

2   happening. The fence was there, the field where the band was

3   playing, and I was over here, and here were -- here's where

4   the stadium seats were at where they were sitting at. So, I

5   asked Cisneros what was happening and he -- he started

6   screaming at me that I didn't know how to control my

7   daughters, I didn't know how to -- how to raise my daughters

8   correctly, and I didn't want to tell him anything because I

9   had the suit on, my uniform on, and I didn't want to fight

10  with him, and I went to the bus to cry.

11              At that time, Mr. Rocillo was the supervisor,

12  and he told me, "Miriam, don't worry about that. That's gonna

13  get solved. Calm down," and then everything calmed down, and

14  then the following day Mr. Rocillo asked me why didn't I go to

15  talk to the principal at the high school and tell him for this

16  man to give you an apology. I went over there to

17  Mrs. Zamora's office, the principal, and I told her that this

18  Mr. Cisneros owed me an apology because he screamed at me in

19  front of all these people, and she made him come over so that

20  he could apologize to me in front of -- there in the office,

21  and since that day Mr. Cisneros never said "hi" to me as

22  before.

23      Q    So, you thought he had it in for you because of

24  that?

25      A    I believe so.

**ESQUIRE DEPOSITION SERVICES**

1    A    Well, if Mr. Gonzalez had talked to me, I would've

2  been able to explain to him what happened in the accident.

3    Q    And that's what you did in your grievance process,

4  correct?

5    A    Yes.  The only thing was that these people talked to

6  Gonzalez and I could not talk to Gonzalez because he did not

7  want to talk to me.  So, he heard everything that the rest

8  told him, and on that they fired me.

9    Q    So, he took what he heard from other people and

10 believed it?

11   A    Uh-huh.

12   Q    And that's why he fired you?

13   A    Well, that's what I think, because had he talked to

14 me like he talked to them, I would've explained to him what

15 had happened.  But he did not let me talk to him.

16   Q    Do you --

17   A    So then he heard the rest.

18   Q    Who made the final decision not to give you your job

19 back?

20   A    Fidela Hinojosa.

21   Q    And you said earlier that she never did anything

22 wrong to you, right?

23   A    No.

24   Q    So, whatever Mr. Gonzalez did or did not do to you,

25 she could've given you your job back?

1    A    Well, she could've.

2    Q    Okay.

3    A    Because I never had anything against her and she

4 knew that I had been working there for years and I never had a

5 problem.

6         MS. BARRERA:  Okay.  I don't think I have any

7 more unless I'm going to have more rebuttal questions.

8                              (Time:  1:36 p.m.)

9 BY MR. PRUNEDA:

10   Q    Ms. Martinez, did Ms. Hinojosa ever tell you that

11 she knew that you had been writing petitions against the

12 school?

13   A    That if she told me?  No.  She knew that I had done

14 a letter asking for payment or a check that they could bring

15 us at a determined time.  In other words, they went and told

16 -- and told her that I was making a letter for the school.

17   Q    And how did you find this out, Ms. Martinez?

18   A    Because she told me that I was making a letter, that

19 somebody had told her.  So, then I told her, "Yes, I have been

20 making letters, but I've made copies, one -- one copy for you,

21 one for Mr. Ruiz and one for my supervisor," and that's where

22 I gave her the copy.

23   Q    Did this confrontation with Ms. Hinojosa occur

24 before or after --

25         MS. BARRERA:  Objection.  That's a

**ESQUIRE DEPOSITION SERVICES**

1  mischaracterization of the testimony.  She never called it a

2  confrontation.

3      Q    (Mr. Pruneda)  What would you call it, Ms. Martinez,

4  when you explained the petition to Ms. Hinojosa?  Was it a

5  meeting or was it you just running into her in the hallway?

6  Could you describe that for the jury?

7              MS. BARRERA:  Objection.  Mischaracterization

8  of environment.  This is a deposition and neither of us have

9  admitted this into exhibit for trial.  It is not before a

10  jury.  This is in front of a court reporter in an informal

11  deposition.

12      Q    (Mr. Pruneda)  Ms. Martinez, you stated that you

13  found out that Ms. Hinojosa had been told that you were

14  writing letters against the school district?

15      A    Yes.

16      Q    How was it that you discussed this with

17  Ms. Hinojosa?

18      A    Well, I went to her office to clear up the letter

19  matter.

20      Q    What letter are we talking about?

21      A    It's a letter that I made so that they could give us

22  the check at the time that we would get out, because we would

23  -- we would have to go for it an hour later.  So, I made this

24  letter so that they could give us the check at the same moment

25  that we would punch out so that the checks would be there

**ESQUIRE DEPOSITION SERVICES**

79

1   ready for us.

2       Q    Who was that letter directed to?

3       A    To the payroll department, where they give the

4   checks.

5       Q    So, you went to talk to her about a letter, not the

6   petition?

7       A    No, it's not about the petition.  I went to go talk

8   to her about the fact that they were saying that I was making

9   letters for -- for a petition for school.  I went to go clear

10  that up, that it wasn't directed at -- at the school.

11      Q    Okay.  I'm a little bit confused.

12      A    Let me explain this better.  We were receiving

13  checks late.  So, then I made a letter, I handwrote it, and at

14  one moment when there was supposedly nobody there at the bus

15  barn, Mr. Basilio Soto came in, our union representative.

16  Then, I was reading to him the letter to see if it was

17  well-written.  So, then, the bus driver passed by there,

18  Nestor Hinojosa.  So, I finished reading my letter and Soto

19  told me that it was okay, very well.  I typed it and made

20  copies of it, when Fidela called me and they told her, she

21  told me, that they were letters, copies against the school.

22      Q    Would you consider this second letter another

23  petition?

24      A    Well, it was a petition, yes.

25      Q    Who signed this other letter?

**ESQUIRE DEPOSITION SERVICES**

1    A    Well, no, nobody managed to sign it.

2    Q    Okay.  Was there a second petition that was ever

3 signed by other employees?

4    A    The petition about regarding several items.  I don't

5 remember how many items there were.  One was regarding the

6 hours.  One -- another one was another driver, the fact that

7 she had pre-K at 6 p.m. and other trips that she was getting,

8 and we were trying for her to not get -- to take away some

9 trips from her to give them to somebody else.

10    Q    Okay.

11    A    I don't remember all the items.  It was like three

12 sheets.

13    Q    Okay.  Thank you.  Now, was it after this second

14 petition that you've just been describing that you called the

15 media?

16    A    Yes, it was after that.  It was Channel 4.

17           MR. PRUNEDA:  Okay.  I'll pass the witness.

18                            (Time:  1:44 p.m.)

19 BY MS. BARRERA:

20    Q    When you went in and talked with Ms. Hinojosa, did

21 she scream at you?

22    A    Not me.

23    Q    Did she yell at you?

24    A    No.

25    Q    Did she threaten you?

1      A     No.

2      Q     Did she tell you, "Stop it.  Don't you ever write

3  any petitions again"?

4      A     No.

5      Q     Did she tell you anything like that?

6      A     No.

7      Q     Did she care that you were writing petitions?

8      A     She didn't tell me anything.  She didn't tell me

9  anything.

10           MS. BARRERA:  Okay.  I don't have any more

11  questions unless I have more rebuttal questions.

12                               (Time:  1:45 p.m.)

13  BY MR. PRUNEDA:

14     Q     Ms. Martinez, did anybody ever accuse you of making

15  petitions during working hours?

16     A     Gonzalez.  He didn't tell me directly, but, in other

17  words, the group, the ones -- those of us who worked there and

18  conversed, they all talk about the things that they hear and

19  talk about in the office and then they come and they tell --

20  say it out here.  Then, they started to say, "Gonzalez said

21  that you were starting to take signatures during working

22  hours."  So, then, I told them, "I don't think I'm doing

23  anything during work hours, because I haven't punched in yet."

24     Q     And who told you this, Ms. Martinez?

25     A     The group that was talking there.  I don't know who

**ESQUIRE DEPOSITION SERVICES**

1    it was at that moment.  I'm going to try to remember to see

2    who it was that talked to me at that moment.  I think that it

3    was the same Nila.  Yes, I think it was her who told me.

4         Q    Who's Nila?

5         A    Leonila Sanchez.

6              MR. PRUNEDA:  Okay.  I'll pass the witness.

7                                        (Time:  1:47 p.m.)

8    BY MS. BARRERA:

9         Q    Did Mr. Gonzalez ever come to you and say, "You've

10   been making copies on our machine"?

11        A    I didn't do anything in school.

12        Q    So, Mr. Gonzalez never came and said anything to

13   you, did he?

14        A    Directly, he never told me anything.  Face-to-face,

15   he never told me anything.

16        Q    Did he ever tell you anything face-to-face about any

17   of your union activity?

18        A    No.

19        Q    So, everything you're saying is because you heard it

20   from someone else who heard it from Mr. Gonzalez, correct?

21        A    Well, in reality, yes.  In reality, he never told me

22   anything directly.  He would never come talk to me directly.

23        Q    Okay.

24        A    Like, for example, that day that he took me out he

25   didn't tell me at the moment, "You're fired."  He didn't

Attorney for Defendant, Los Fresnos Consolidated
    Independent School District:

HONORABLE ANGELICA E. RODRIGUEZ-BARRERA
McKinney & Rodriguez-Barrera, P.C.
615 N. Upper Broadway, Suite 1280
P.O. Box 2747
Corpus Christi, Texas   78403

   I further certify that I am neither counsel for, related

to, nor employed by any of the parties or attorneys in the

action in which this proceeding was taken, and further that I

am not financially or otherwise interested in the outcome of

the action.

   Certified to by me this 9th day of December, 2001.

                 _____
                 NA RAMIREZ, Texas CSR #2267
              tion Date:  12/31/2001
          Esquire Deposition Services
            .H. 10 West, Suite 100
            Antonio, Texas   78230
          (210) 337-3027



A quien le conciernе:

Estaba viajando de Los Fresnos a Corpus Christi en el Bus #9 con las muchachas de la Banda de H.S. con el Sr. Cisneros y otro maestro, del cual no sé su nombre, cuando ya avanzada la mañana, me dio un golpe muy fuerte en el cuello que parecía un puñal enterrado, entonces fui a jorobarme el cuello hacia la izquierda donde provenía el dolor, y con la mano derecha traté de hacerme esto y con la izquierda mantuve el volante, pero se me fue el Bus por el lado derecho arriba de los shoulder, y mantuve el Bus en esa posición por espacio de 5 a 10 segundos para fijarme bien que no venía ningún vehículo detrás de mí y entonces me metí en el lane derecho otra vez. Pero nunca me fui al socorte como dijo Mr. Cisneros, eso fue todo lo que pasó ahí. Luego cuando fuimos el Whataburgue por que compraron almuerzo para las muchachas, entramos en uno que tenía muy poco espacio por los de buses y la troca y yo tuve que pararme al lado de una pequeña caseta que estaba cercada por el piso con esos pedazos de cemento que ponen en los parqueos para dividir. Al querer salir de ahí me puse a fijarme en los pedazos de cemento para no subirme con las llantas de atrás del Bus y no me fijé pero el techo de la caseta estaba muy sobresalido y me raspó la ventana del lado izquierdo y me explotó la ventana en pedazos muy pequeños. Yo traté de salir lo mejor que pude y pone y arreglé el Bus en otra posición que podía salir mejor, pero antes les pregunté si había algún herido o lastimado y el Sr. Cisneros me dijo que no.

LFCISD.000235

Entonces continué manejando. Cuando llegamos al lote que íbamos, se bajaron todos y fuimos y paramos el Bs en el porque apropiado y tuvimos que buscar en las cajas vacías del Water burger si había quedado alguna corrida para nosotros poder almorzar porque a nosotros no nos ofrecieron nada de comer. Hasta que terminaron y nos llevaron a comer al Restaurante. Ahí nos dijo el Sr. Cisneros que en Bus y la Troca se iban a regresar a Los Fresnos y en Bus se iba a quedar en Corpus para ir al Mall. Por supuesto a mí me dijo que me regresara con otro maestro que había ido en el Bus #8 con Rosalinde. Nos regresamos y en el camino había una troquita pequeña roja que estaba viajando muy despacio enfrente a mí y yo lo pasé por la izquierda y mientras que estaba al lado de la troquita pasé por un lugar donde me pasó un aire fuerte y me empujó para el lado derecho y las llantas se subieron un poco en la ralla blanca del medio de la carretera. Yo estaba viendo la troquita cuando el maestro me gritó bien fuerte "Watch up man". Yo le dije "What", El me dijo que por poco le pegaba a la troca pero no era cierto porque yo no pasé la linea blanca, fuimos en seguido nada más y al rato me dijo que me parara en la gasolinera para ir al baño. Se bajó y fue a la troca y hablo con Raymundo y este se bajaron el y se fueron al telefono, de ahí se fueron a la tienda y cuando regresaron, el maestro se subió al Bus y se sentó y entonces Raymundo me preguntó que si yo me sentía mal y yo le dije que no y él me dijo que si yo queria que él se llevaba el Bus y yo la troca y yo le dije que no, porque yo no me sentía mal y le dije que yo seguiría mi camino con el Bus. Raymundo se movió y hablo con el maestro y le explicó que había seguido y se bajó del Bus y se fue a su troca y seguimos el viaje a Los Fresnos. Lo que yo creo es que el Sr. Cisneros ya la tiene conmigo porque ya tuve un problema con el

LFCISD.000236

...estar con él y mis hijos y él nunca se arrepintió de tratarme toda lo que hizo y como yo le obligué a pedirme una disculpa en frente de Mrs. Zamora, esto no lo perdona el Sr. Cisneros. Yo nunca he tenido ninguna queja de ningún maestro en los 9 años que llevo de manejar en el distrito de Los Fresnos, no sé porque cuando me dio ese dolor y yo reaccioné, este Sr. se puso como se puso. Yo le pedí perdón por lo que había pasado en cuanto llegue a Corpus pero parece que él ni me oyó lo que le dije. Esto es mi reporte del día Mayo 1 del 1999 de lo que pasó en ese viaje a Corpus Christi con el Bus #9.

Miriam Martínez

LFCISD.000237

To whom it may concern:                    Stamped Received: May 5, 1999

I was traveling from Los Fresnos to Corpus Christi in Bus #9 with the High School band students and with Mr. Cisneros and another teacher, of which I don't know his name. Later in the morning, I felt a very strong pain in my neck that felt like a stabbing dagger. I massaged my neck towards the left where the pain was coming from, and I tried to do this with my right hand and with the left I held the steering wheel, but the bus moved to the right side onto the shoulder and I maintained the bus in that position for about 5 to 10 seconds to make sure that no cars were behind me and then I entered the right lane again. But I never went into the grass like Mr. Cisneros said, that was all that happened there.

Then, when we went to Whataburger because they purchased breakfast for the kids, we went to one that had very little space for the two busses and the truck and I had to park next to a small shed that was surrounded on the ground with pieces of cement that they put in the parking for dividing. When I tried to exit from there, I started to look for the cement pieces so that I would not go over them with the back tires of the bus and I didn't notice that the roof of the shed was overhanging and it scratched the window on the right side and the window exploded into very small pieces. I tried to exit the best I could and I placed the bus in another position where I could exit better, but before I did that I asked if anyone was hurt or injured and Mr. Cisneros said no. I then continued my route.

When we arrived to the place where we were going, everyone got down and we went and parked the bus in the appropriate parking and we had to look in the empty Whataburger boxes to see if any food had been left for us to have breakfast because they did not offer us anything to eat until they finished and then they took us to eat to the restaurant. There Mr. Cisneros told us one bus and the truck were going to return to Los Fresnos and the other bus would be staying in Corpus to go to the Mall. And of course, he told me to return with the other teacher that had come in Bus #8 with Rosalinda.

We came back and on the road there was a small red truck that was traveling very slow in front of me and I passed it on the left side. While I was on the side of the small truck, I was going through a place where the wind blew very strong and it prompted me to go towards the right side and the tires crossed a little bit on the white line in the middle of the road. I was looking at the small truck when the teacher yelled at me very loudly "wake up man", and I told him "what". He told me you almost hit that truck, but that was not the truth because I did not pass the white line. It was only a few seconds and in a while he told me to stop at the gasoline station to go to the bathroom. He got down and went to the truck to speak to Raymundo and he got down with him and they went to the phone. From there they went to the store and when they returned, the teacher got on the bus and he sat down and Raymundo asked me if I was feeling ill and I told him no and he told me if I wanted he could drive the bus and I could drive the truck and I told him no, because I did not feel ill and I told him that I would continue my route with the bus. Ray came and spoke with the teacher and explained what had occurred and he got down from the bus went to his truck and we continued the trip to Los Fresnos.

What I believe is that Mr. Cisneros already had it in for me because I had a problem some time back with him and my children and he never regretted having done what he did and since I forced him to apologize in front of Ms. Zamora, this Mr. Cisneros will never forgive me for.

---

**T R A N S L A T I O N**

I have never had any complaint from any teacher in the 9 years that I have been driving for the Los Fresnos District.

I don't know why, when I got that pain and I reacted, this man got the way that he did.  I asked him to please forgive me for what had happened the moment we got to Corpus, but it seems like he did not hear what I told him.

This is my report of the day of May 1ˢᵗ of 1999 of what happened on that trip to Corpus Christi with Bus #9.


*Miriam Martinez's signature*


LFCISD.000239


**T R A N S L A T I O N**

1. You did not talk to me on date of incident May 1, 1999; I first talked to you on May 3, 1999, at 11:00 a.m.

Response:

I did not speak to you on May 1, 1999, about the incident because I was not aware anything had occurred during the trip. I spoke to you twice on the radio on that day and you failed to advise me that any incidents had occurred on the trip. Also when I asked for you on Monday, May 2, 1999, I was advised that you had not reported to work. You reported being ill. I did not get an opportunity to speak to you until May 3, 1999, at which time I referred the incident to Saul Basaldu, your immediate supervisor.

2. On date, May – 1999, I advised you that you were to speak to Fidela Hinojosa. At that time, I requested your I.D. Badge, and asked you to clear your locker.

Response:
When you were brought into my office, you were advised that you were suspended from work until further notice. I requested that you return the identification badge, remove personal items from bus 78, and return lock and clean out your locker. Sylvia Stamps witnessed this meeting.

3. On the following morning, you told me in front of witness that I was suspended.
Response:

On the following morning you failed to follow instructions and reported to work. I reminded you again that you were suspended until further notice. You insisted on being told again that you were suspended in front of your co-workers. Even though it was a confidential issue.

4. When, I (Mariam Martinez) spoke to Fidela Hinojosa; she advised me that I (Guadalupe Gonzales) had terminated her employment.

When you met with Ms. Hinojosa she advised you that you were terminated. She concurred with my recommendation for termination of employment.

5. I, Guadalupe Gonzales, never asked what happened on the incident of May 1, 1999, That I made a decision on someone else's information.
Response:

Your immediate supervisor investigated your incident obtained the facts, employee statements, and sponsor statement. My decision to recommend termination was based on your supervisor investigation and my communications with the sponsors.

LFCISD.000208

6. She states that on termination notice, I stated that one of the reasons that I terminated was because of the broken window. She claims other windows have been broken and the driver is not disciplined.

Response:

**One of the reasons stated in the termination notice was because of the carelessness and inability of the driver to recognize the potential hazard for the passengers and vehicle. An experienced driver should have recognized this hazard and avoided the broken window incident.**

7. The termination notice, also states that the driver drifted onto the grass and she states that she never drifted onto the grass.

Response:

**The sponsor and drivers, three different people, reported the same incident, they also reported other incidents where the driver was drifting sideways on the lane; but only once where she drifted onto the grass. They also reported that the driver appeared confused and that she jerked the bus back onto the road. This sudden jerking motion is also not recommended in the state mandated bus certification training.**

8. The termination notice, also stated she exceeded the legal speed limit, and she states that legal limit on highway 77 is 65 miles per hour, but that school buses on leaving the city limit, the speed limit is 55 miles per hour. Mr. Moody taught Mariam Martinez, it is what I, in the bus certification classes.

Response:

**I recognize that the posted speed limits on different sections of Highway 77, between Los Fresnos and Corpus Christi vary. The majority of the speed limit is 70 miles per hour for day and 65 miles per hour for night for cars. The truck speed limit is 60 miles per hour for day and 55 miles per hour for night. The speed limit for school buses is 50 miles per hour and is mandated by Texas law.**

9. The termination notice also states, while attempting to change lanes, it should read I changed lanes because the truck in front was traveling at 40 miles per hour. The lane was changed because of this; I never hit or passed close to the pickup, because I was viewing from my mirrors. The teacher yelled at me, I do not know why, he should have never yelled at me.

Response:

**Ms. Martinez is confused by this statement, she is correct in say the vehicle in front of me was traveling at low rate of speed, slower than the bus. I changed lanes to pass the vehicle. What**

Question listing

May 1, 1999
Incident
Page 3 of 3

I am saying is that while she was in the left lane attempting to pass the vehicle she misjudged the distance between the end of her bus and the location of the other vehicle on the right lane. She attempted to change lane from the left to the right and the sponsor yelled at her to avoid hitting the other vehicle.

10. The termination notice also stated, the driver failed to relinquish the bus, at the request of the sponsor, but the sponsor never mentioned anything to me, he never directed a word to me. He spoke to the other driver. The other driver asked if I felt ill, and I said no. He then mentioned or told me, that if I wanted, he could drive the bus and I could drive the truck. She replied, she felt good and had no problems, she also did no have her supervisor's order to give up her bus. She further states, that she had no order to give her bus and especially to one that is not certified to drive a bus.

Response:

The sponsor discussed with the truck driver his concerns about the bus driver and recommended that the drivers swap vehicles. They attempted to telephone me; but they were unable to reach me by phone. The sponsor then sent the driver to relinquish the bus and Ms. Martinez rejected the request.

11. The termination notice also states, this incident placed the students, sponsors, and bus in a hazardous situation. She further states she never placed the students, sponsors, and bus in a hazardous situation, because she did not have accident and I consider myself a good driver after nine years of experience, with out an accident. A good driver knows how to control her bus in any situation.

Response:

Ms Martinez does not fully realize the potential seriousness of the different incidents or the districts and parent entrusted care on her judgement. The probability of serious injury or death, material damages, and monetary costs associated with an accident of this potential magnitude.

LFCISD.000210

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MIRIAM MARTINEZ | § | |
| | § | |
| VS. | § | C.A. NO. B-01-095 |
| | § | |
| | § | Removed from the 404th |
| | § | District Court of Cameron |
| LOS FRESNOS CONSOLIDATED | § | County, Texas |
| INDEPENDENT SCHOOL DISTRICT | § | |

## NOTICE OF SETTING FOR DEFENDANT LOS FRESNOS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT

Defendant's Motion for Summary Judgment is hereby set for hearing on the

_____ day of February, 2002, at _____ a.m./p.m.


SIGNED AND ENTERED the _____ day of _____, 2002.



_____
UNITED STATES MAGISTRATE JUDGE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MIRIAM MARTINEZ                        §
                                       §
VS.                                    §                    C.A. NO. B-01-095
                                       §
                                       §                    Removed from the 404th
                                       §                    District Court of Cameron
LOS FRESNOS CONSOLIDATED               §                    County, Texas
INDEPENDENT SCHOOL DISTRICT            §

## ORDER GRANTING DEFENDANT LOS FRESNOS CONSOLIDATED INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT

On the _____ day of _____, 2002, came on to be considered the

Defendant, Los Fresnos Consolidated Independent School District's, Motion for

Summary Judgment.

This Court is of the opinion that said Motion for Summary Judgment should be

GRANTED, and therefore, it is ORDERED that all claims against Defendant, Los

Fresnos Consolidated Independent School District's, are hereby dismissed.

SIGNED AND ENTERED the _____ day of _____, 2002.


_____
UNITED STATES MAGISTRATE JUDGE