30

United States District Court
Southern District of Texas
FILED

FEB 1 2 2002

Michael N. Milby
Clerk of Court

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MIRIAM MARTINEZ      ◆
     ◆
     ◆
V.      ◆      Civil Case No. B-01-095
     ◆
LOS FRESNOS CONSOLIDATED      ◆
INDEPENDENT SCHOOL DISTRICT      ◆

---

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

---

TO THE HONORABLE JUDGE OF THIS COURT:

COMES NOW, the Plaintiff MIRIAM MARTINEZ, and files the following arguments, objections, points of law and further points to evidence that is incorporated by reference in response to Defendant's Motion for Summary Judgment. The Defendant is not entitled to a summary judgment in that evidence exists of unlawful discrimination, plaintiff is able to prove her *prima facie* case and issues of fact remain which require a jury to resolve. In support, Plaintiff would show as follows:

I.
## CASE SUMMARY

Plaintiff herein has filed a political retaliation lawsuit under the Texas Constitution and U.S. Constitution. Plaintiff was discriminated against during the course and scope of her duties while employed with defendant subsequent to her exercise of free speech on matters of public concern. Plaintiff was the subject of intentional discriminatory conduct by defendant's management that was to an impermissible extent based on Plaintiff's speech ultimately culminating with the firing of plaintiff.

II.

## ISSUES RAISED BY DEFENDANT

The defendant is attempting to escape liability for the damages caused to the Plaintiff as a result of the discriminatory treatment that she received.  The defendant contends that it is entitled to escape liability for the following reasons:

(1)    The plaintiff's speech was not on a matter of public concern;

(2)    The plaintiff fails to show that the speech was a "substantial or motivating factor" in the termination, or more specifically, fails to show a causal connection between the speech and the termination;

(3)    The defendant is not liable because it would have taken the same action in the absence of the protected conduct.

III.

## *POLITICAL DISCRIMINATION*

1.    The defendant herein contends that it is entitled to judgment as a matter of law because Plaintiff cannot prove that there is evidence of her *prima facie* case arising from her protected speech; however, Plaintiff points to evidence indicating that a reasonable and objective jury would conclude Plaintiff was discriminated against because of her associations and speech.  The non-movant must make a *showing of proof*, not produce admissible evidence.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  Once plaintiff establishes an inference of discrimination, the consideration of the same inferential evidence can be used in establishing direct or circumstantial evidence of discrimination and pretext.  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000).

2.    The threshold inquiry for determining if speech is protected is whether the employee's speech involved a matter of public concern which must be determined by the "content, form, and context of a given statement."  *Connick v. Myers*, 461 U.S. 138, 147-148 (1983); *Pickering v. Board of Education*, 391 U.S. 563 (1968).  The same analysis is applied where government employees allege retaliation resulting from their association with an organization or group.  *Anderson v. Pasadena Independent School Dist.*, 184 F.3d 439, 444 (5th Cir.); *Kennedy v. Tangipahoa Parish Library*, 224 F.3d 359 (5th Cir. 2000) (library supervisor discharged after writing letter to library board expressing

concern for safety of local librarians—public concern); *Baldassare v. State of New Jersey*, _____ F.3d _____, 2001 WL 460102 (3d Cir. 2001) (county investigator demoted and fired for investigating police officers' accused of wrongdoing—public concern); *Belk v. City of Eldon*, 228 F.3d 872 (8th Cir.) (employee fired after informing town officials that her supervisor was giving another employee benefits to which she was not entitled—public concern); *Gable v. Lewis*, 201 F.3d 769 (6th Cir.) (female tow truck operator removed from referral list for filing sex discrimination complaint—public concern); *Lucas v. Monroe County*, 203 F.3d 964 (6th Cir.) (tow-truck operator removed from referral list for criticizing sheriff's administration—public concern); *Barker v. City of Del City*, 215 F.3d 1134 (10th Cir. 2000) (assistant to city manager fired after talking to reporter—public concern); *Butcher v. City of McAlester*, 956 F.2d 973, 978-980 (10th Cir. 1992) (firefighter's union activity protected by First Amendment); *Morphin v. Albuquerque Public School*, 906 F.2d 1434 (10th Cir. 1990) (First Amendment protects right of public employee to join and participate in labor union and associate with labor union)

3.  The evidence indicates that the Plaintiff had been a member of a union for many years and publicly voiced her concerns many times so that problems encountered could be fixed. *(See Plaintiff's Deposition at 14-15)* The Plaintiff would always attend the meetings that occurred monthly or every two to three months. *(See Plaintiff's Deposition at 16)*  The main goals of the union related to helping local public employees such as maintenance, cafeteria and transportation workers receive work hours.  Following many union meetings, letters were sent to the Plaintiff's school so the problems could be addressed. *(See Plaintiff's Deposition at 17)*  Many times Plaintiff spoke directly to supervisor Mr. Gonzalez. *(See Plaintiff's Deposition at 18)* When Gonzalez began to cut hours from the workers and placing new people in positions that were saved for workers with more seniority, Plaintiff directly called the local media, T.V. Channel 4, so that light could be shed on the problem and so that everyone in the public could see how the workers were being treated. *(See Plaintiff's Deposition at 19)* Plaintiff believes that she was targeted because she made Gonzalez look bad in front

of others. *(See Plaintiff's Deposition at 20)* Gonzalez didn't like Plaintiff to complain about problems that were occurring in the bus barn. Plaintiff and others voiced their opinion about the district slowly cutting the hours of experienced workers. *(See Plaintiff's Deposition at 21)* The newer employees, not heavily associated with the union, were receiving more work hours. *(See Plaintiff's Deposition at 23)* Plaintiff wrote a letter complaining that things be done about the hours, the reduction in hours, and not giving the workers enough trips. *(See Plaintiff's Deposition at 24)*

4.    Many employees who were friends with Gonzalez would punch in earlier than others and would not get reprimanded for working more time. *(See Plaintiff's Deposition at 33-34)* Many times, Plaintiff's supervisor would eavesdrop into conversations a group of workers was having to see what the discussion concerned. *(See Plaintiff's Deposition at 61)* Plaintiff also complained of Gonzalez when certain employees were being excluded from a Thanksgiving dinner by Gonzalez. Plaintiff's complaint angered Gonzalez. *(See Plaintiff's Deposition at 63)* Gonzalez recommended Plaintiff's termination without ever interviewing Plaintiff or discussing any complaints against her even though Plaintiff had been a good employee for many years. *(See Plaintiff's Deposition at 75-77)* During a meeting when Plaintiff complained about receiving paychecks an hour after they punched out instead of at the same time, Fidela Hinojosa the supervisor who fired Plaintiff, told Plaintiff that she had been told Plaintiff was writing petitions against the school district. Around the same time, employees complained to Plaintiff that Gonzalez complained Plaintiff was collecting signatures for a petition during working hours. *(See Plaintiff's Deposition at 81)*

5.    Clearly, Plaintiff participated in protected speech many times during her employment with the school district. This protected activity and speech was not looked upon positively by Plaintiff's supervisors. Plaintiff was constantly watched. Plaintiff was also the most active in bringing issues to light concerning work hours and equal and impartial treatment. Plaintiff even brought these problems to the media in hopes of gaining public support. Despite the negative attitude displayed by Defendant towards Plaintiff's activities, complaints, and speech, it now argues

Plaintiff's speech and activities were not of public concern and thus not protected by law. Clearly, Plaintiff exercised rights granted to her under the laws of Texas and the U.S.

6.      The Defendant also alleges that plaintiff failed to show that the speech was a "substantial or motivating factor" in the termination, or more specifically, failed to show a causal connection between the speech and the termination. However, the evidence indicates that Plaintiff's speech involved Gonzalez who recommended Plaintiff's termination without conducting a proper investigation prior to terminating her. Gonzalez also complained that Plaintiff was petitioning during working hours. Furthermore, Hinojosa told Plaintiff that she knew Plaintiff was collecting signatures during working hours. The totality of the circumstances bring to light the working environment of Plaintiff and the adverse and hostile feelings of the administration towards Plaintiff. A jury would likely find Plaintiff was treated less favorably as opposed to others who were not outspoken or union active.

7.   The defendant further alleges that is not liable because it would have taken the same action in the absence of the protected conduct. However, the evidence indicates that other employees were paid more time than others because they punched in earlier and were never reprimanded because they were close friends of administration. Clearly, illegal payment of wages is a matter that should have been closely scrutinized and warranted remedial action. Additionally, many people broke windows and wouldn't get reprimanded, suspended or fired, unlike plaintiff. *(See Plaintiff's Deposition at 39)* Plaintiff was employed for many years and was not given the benefit of an investigation or interview prior to her termination.

8.   As a result of the evidence presented, Plaintiff's claims warrant consideration by a jury and not judgment as a matter of law.

IV.
# FACT ISSUE REMAINS ON DEFENDANT'S INTENT
## IN TERMINATING THE PLAINTIFF

1.      The world would be a much better place if employers would simply admit wrongdoing when they illegally discriminate against their employees. Unfortunately, the reality of

things is that individuals and employers who discriminate are rarely if ever going to admit that they violated the law. This smoking gun or direct evidence is rarely seen in discrimination cases. Recognizing this reality, the Courts have repeatedly held that the employee may prove his employer's discriminatory intent by *circumstantial evidence* and *by reasonable inferences arising from it.* *Quantum Chem. Corp. v. Toennies*, _____ S.W.3d _____ at _____ (Tex. 2001); *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133 (2000); *Gold v. Exxon Corp.*, 960 S.W.2d 378, 381-382 (Tex.App.—Houston[14th Dist.] 1998).; *Continental Coffee Products Co. v. Cazarez*, 937 S.W.2d 444, 451 (Tex. 1996); *America West Airlines, Inc. v. Tope*, 953 S.W.2d 908 (Tex.App.--El Paso 1996); *Investment Properties Management v. De Montes*, 821 S.W.2d 691, 694 (Tex.App.--El Paso 1991, no writ); *Paragon Hotel Corp. v. Ramirez*, 783 S.W.2d 654, 658 (Tex.App.--El Paso 1996, writ denied).

2.    After careful review and analysis, more than one and possibly all of the related legal factors have been violated by the Defendant under the claims for which Plaintiff seeks remedy. The Defendant claims that summary judgment should be granted because its word is good and that should be good enough for the court. The Plaintiff, it therefore claims, has no case. Unfortunately for the defendant and fortunately for the average person the Texas Constitution guarantees each person the right to a trial before ones peers when factual disputes are involved. *Texas Constitution Article 5.*

3.    In this case, the plaintiff vigorously disputes that she was fired for the reasons claimed by the defendant. Plaintiff further has brought forward evidence to establish her cause of action. Summary judgment cannot be granted when the evidence submitted raises an issue of fact and is sufficient to prove the plaintiff's case. T.R.C.P. 166a; Fed. R. Civ. P. 56; *Worsham v. Steel Co. v. Arias*, 831 S.W.2d 81 (Tex.App.--El Paso 1992, no writ (*Since this Court is not a fact finder, it may not pass on the credibility of the witnesses or substitute its judgment for that of the trier of fact, even if the evidence would clearly support a different result.*).

4.      In the present case, the plaintiff has met her burden.  The circumstantial evidence (and reasonable inferences) presented in this response proves plaintiff's prima facie case and creates a fact issue that precludes the granting of a summary judgment.  Defendant's motion should accordingly be denied.

## V.
## MATERIAL ISSUES OF FACT
## REMAIN UNSOLVED

As will be evident by the arguments, points of law and summary judgment evidence submitted on this motion, there are genuine issues of material fact that prevent the granting of a summary judgment in favor of the Defendant.  Contrary to Defendant's assertions, a jury will be necessary to resolve the following factual disputes:

a).   Does Plaintiff have evidence to show that she was exercising her rights by communicating matters of public concern?

b).   Does Plaintiff have evidence to show that she was fired by the Defendant motivated by her exercise of speech on matters of public concern?

c).   Does Plaintiff have evidence that she was fired because of her participation in matters of public concern, including but not limited to, union activities, writing petitions, speaking out, and speaking with the news media?

## VI.
## SUMMARY OF PROOF

In support of this Response, Plaintiff points to and relies on the following evidence that is incorporated by reference:

(1)   Excerpts from Plaintiff's deposition.

WHEREFORE PREMISES CONSIDERED, Plaintiff prays upon final hearing, the Court deny Defendant's Motion for Summary Judgment, and for such other and further relief to which Plaintiff may be justly entitled to, both in law and in equity.

Respectfully submitted,

THE PRUNEDA LAW FIRM, P.L.L.C.

P.O. Box T
Pharr, Texas 78577
Tel: (956) 702-9675
Fax: (956) 702-9659

By: _____

MICHAEL PRUNEDA
State Bar No. 24025601

ATTORNEY FOR PLAINTIFF


# CERTIFICATE OF SERVICE

I do hereby certify that a true and correct copy of the above has this day been delivered to the following attorney of record:

Phillip McKinney
MCKINNEY & RODRIGUEZ-BARRERA
615 N. Upper Broadway, Suite 1280
P.O. Box 2747
Corpus Christi, Texas 78403

SIGNED this 11th day of Feb, 2002.


_____

MICHAEL PRUNEDA

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

MIRIAM MARTINEZ             ◆
                                   ◆
                                   ◆

         V.                        ◆       Civil Case No. B-01-095
                                   ◆

LOS FRESNOS CONSOLIDATED    ◆
INDEPENDENT SCHOOL DISTRICT   ◆

## ORDER DENYING DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT

On this day came to be considered the Defendant's Motion for Summary Judgment filed herein

by Defendants and the Court, after reviewing the Motion, Response and arguments of counsel, is of

the opinion that the same should be DENIED.

It is THEREFORE ORDERED, ADJUDGED AND DECREED that Defendant's Motion for

Summary Judgment is hereby DENIED.

SIGNED this _____ day of _____, 2002.

 

                                _____
                                JUDGE PRESIDING

Phillip McKinney
MCKINNEY & RODRIGUEZ-BARRERA
615 N. Upper Broadway, Suite 1280
P.O. Box 2747
Corpus Christi, Texas 78403

Michael Pruneda
THE PRUNEDA LAW FIRM, P.L.L.C.
P.O. Box T
Pharr, Texas 78577

James P. Grissom
2408 N. Conway
Mission, Texas 78572

Case 1:01-cv-00095   Document 30   Filed in TXSD on 02/12/2002   Page 10 of 31

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
BROWNSVILLE DIVISION

| | | |
|---|---|---|
| MIRIAM MARTINEZ | } | |
| | { | C.A. No. B-01-095 |
| VS | } | |
| | { | Removed from the 404th |
| LOS FRESNOS CONSOLIDATED | } | District Court of |
| INDEPENDENT SCHOOL DISTRICT | { | Cameron County, Texas |

*******************************************************

ORAL DEPOSITION OF

MIRIAM MARTINEZ

NOVEMBER 30, 2001

*******************************************************

ORAL DEPOSITION of MIRIAM MARTINEZ, produced as a witness at the instance of the Defendant and duly sworn, was taken in the above-styled and numbered cause on the 30th day of November, 2001, from 10:27 a.m. to 1:51 p.m., before DINA RAMIREZ, CSR in and for the State of Texas, reported by oral stenography at the offices of James P. Grissom, 2408 North Conway, Mission, Hidalgo County, Texas, pursuant to the Federal Rules of Civil Procedure and the provisions stated on the record or attached hereto.

Case 1:01-cv-00095   Document 30   Filed in TXSD on 02/12/2002   Page 11 of 31

Miriam Martinez
November 30, 2001

Mu'ti-Page

Miriam Martinez
v. Los Fresnos Consolidated I.S.D.

Page 2

A P P E A R A N C E S

FOR THE PLAINTIFF, MIRIAM MARTINEZ:

    HONORABLE MICHAEL PRUNEDA

    The Pruneda Law Firm, P.L.L.C.

    P.O  Box T

    Pharr, TX  78577

FOR THE DEFENDANT, LOS FRESNOS CONSOLIDATED

    INDEPENDENT SCHOOL DISTRICT:

    HONORABLE ANGELICA E  RODRIGUEZ-BARRERA

    McKinney & Rodriguez-Barrera, P.C.

    615 N  Upper Broadway, Suite 1280

    P.O. Box 2747

    Corpus Christi, Texas   78403

ALSO PRESENT:  Mr  Billy Torres

    Mr. Alberto Trevino, Interpreter

    Davila & Associates, Inc.

    4900 N. 23rd Street

    McAllen, Texas   78504

Page 4

| No. | 8 | Translation in English of Plaintiff's statement, re:  incident of May 1, 1999 (2 pp.) | 69 |
| No. | 9 | Handwritten statement in Spanish of Plaintiff, re:  incident of May 1, 1999 (3 pp ) | 71 |
| No. | 10 | Termination form for Plaintiff dated May 13, 1999 (1 p.) | 75 |

REQUESTED DOCUMENTS/INFORMATION

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| 1 | Name of third person who left who signed petition | 26 |

Page 3

I N D E X

Appearances. . . . . . . . . . . . . .   . . . .  2

Stipulations . . . . . . '. . . . . . . . . . . .  5

MIRIAM MARTINEZ
    Examination by Ms. Barrera . . . . . . . . . .6
    Examination by Mr. Pruneda . . . . . . . . . .74
    Examination by Ms. Barrera . . . . . . . . . .75
    Examination by Mr. Pruneda . . . . . . . . . .77
    Examination by Ms. Barrera . . . . . . . . . .80
    Examination by Mr. Pruneda . . . . . . . . . .81
    Examination by Ms. Barrera . . . . . . . . . .82

Signature and Changes. . . . . . . . . . . . . .85

Reporter's Certificate  . . . . . . . . . . . . .87

E X H I B I T S

| NO. | DESCRIPTION | PAGE |
| --- | --- | --- |
| No.  1 | Drawing by witness, re:  accident at Whataburger (1 p.) | 42 |
| No.  2 | Verification page to Plaintiff's Answers to Defendant's First Set of Interrogatories (1 p.) | 54 |
| No.  3 | Plaintiff's Answers to Defendant's First Set of Interrogatories and Request for Admission (17 pp.) | 56 |
| No.  4 | Memorandum from C.H. Vochatzer to Mirian Martinez, dated September 20, 1989, re: bus accident of September 15, 1989 (1 p.) | 64 |
| No.  5 | Memorandum of Rosalinda Rios dated 5/7/98 (1 p.) | 65 |
| No.  6 | Memo from Frank Cisneros to Dr. Eliseo Ruiz dated May 7, 1999, re:  bus incident of May 1, 1999 (1 p.) | 66 |
| No.  7 | Statement of Remigio Garza, re:  incident May 1, 1999 (7 pp.) | 66 |

Page 5

1    Oral deposition and answers of MIRIAM MARTINEZ, who
2  resides in Cameron County, Texas, was taken herein by the
3  Counsel for the Defendant before DINA RAMIREZ, a Certified
4  Shorthand Reporter and a Notary Public in and for the State of
5  Texas, on the 30th day of November, A.D., 2001, pursuant to
6  First Amended Notice issued in the above styled and numbered
7  cause and pursuant to the Federal Rules of Civil Procedure.
8    IT WAS AGREED that ALBERTO TREVINO may act as Interpreter
9  for the taking of this deposition, and the oath of the
10  Interpreter was duly administered.
11
12        * * *
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 6

(Interpreter sworn.)

MIRIAM MARTINEZ,

having been first duly sworn, testified through the duly sworn interpreter as follows:

EXAMINATION

BY MS. BARRERA:

Q   Ms. Martinez, my name is Angelica Barrera and I represent Los Fresnos Consolidated Independent School District in this lawsuit. Do you understand that?

A   Uh-huh.

Q   Have you ever had your deposition taken before?

A   No.

Q   Okay. I'm gonna -- I'm sure that your attorneys have gone over it with you, so I'm just going to lay down some ground rules. This is a court reporter and she's taking down stenographically what you're saying, and she can't take down if you shake your head or wave your hands or something like that. Okay? So, all of your answers need to be verbal. Okay?

A   Okay.

Q   Okay. Can you state your name for the record?

A   Miriam Martinez.

Q   Okay. Ms. Martinez, if ever I ask you a question that you don't understand, feel free to stop me and ask me to repeat myself. Okay?

Page 7

A   Okay.

Q   Okay. If you need to take a break, let me know and -- and we'll take a break.

A   Okay.

Q   My purpose here today is to try to gather information from you. Okay? This is so that I can properly advise my clients about the best way to go in this lawsuit. Okay?

A   Okay.

Q   Okay. Are you currently employed, Ms. Martinez?

A   No.

Q   Okay. Why aren't you employed right now?

A   Because I'm awaiting for them to return my job.

Q   Okay. Have you been -- have you been trying to find a job somewhere else or have you just been waiting?

A   I'm waiting for my job.

Q   Okay. So, you haven't --

A   It's the one that I -- that I wish, that I like.

Q   Okay. That brings up another good point. If I don't let you finish your answer, just let me know that you haven't finished and I'll stop so that you can completely finish your answer. Okay?

A   Okay.

Q   Okay. So, have you, then, not submitted an application anywhere?

Page 8

A   No.

Q   Okay. Do you know of any positions that have been open that you might be qualified for but that you just didn't apply?

A   Where? In Los Fresnos or where?

Q   In any -- in any surrounding area that wouldn't be too much of an inconvenience, Edinburg, Mission, Los Fresnos.

A   No.

Q   Okay. How long were you employed with Los Fresnos?

A   Eleven years.

Q   And was that a continuous 11 years?

A   Yes.

Q   Okay. There wasn't any period that you resigned or stopped working with them?

A   No.

Q   Okay. And what positions did you have with Los Fresnos?

A   The first years, I was working in the cafeteria. I was working for the cafeteria and then I was working for transportation and cafeteria at the same time, and then I left the cafeteria and worked for transportation.

Q   Okay. Do you know how long you worked solely for the cafeteria?

A   For five years.

Q   And how long did you have a dual role with

Page 9

transportation and the cafeteria?

INTERPRETER: Excuse me?

MS. BARRERA: How long did she have a dual role? How long was she with both places?

A   I don't remember how many years I worked dually.

Q   (Ms. Barrera) And that's okay. If you don't know, you just tell me you don't know and -- and we'll move on. Do you know how long you were just with transportation?

A   For nine years.

Q   Okay. I want to focus mainly on those nine years where you were just for transportation. Okay?

A   Okay.

Q   Who were your supervisors during those nine years?

A   The first one was Mr. Trevino. Then, it was Mr. Jesus Sanchez. Then, it was Moody, Mr. Rocillo, and then Mr. Gonzalez. He was the last one.

Q   Okay. And was Mr. Gonzalez your supervisor when the May, 1999, incident happened?

A   Yes, correct.

Q   Okay. When you were with transportation, what was your main job, what was your -- your title?

A   (By the Interpreter) Bus driver.
(In English) Bus driver.

Q   Okay. And what type of responsibilities did you have as a bus driver?

### Page 10

1  Well drive the bus and take care of the children,
2  drop them from school and then take them back to their house
3  safely in the afternoons.
4      Q  Okay.  Did you have any responsibilities in regards
5  to the bus itself?
6      A  Yes.  We had to check the oil, the water, everything
7  that corresponds to it, the lights, the brakes, the seats,
8  have it clean, maintain it clean.
9      Q  Okay.  When you were operating a bus, whether it was
10 with children or without children, did you have a
11 responsibility to keep that bus safe?
12     A  What do you mean, "safe"?
13     Q  To not damage it, to not drive it improperly, to not
14 vandalize it.
15     A  Well, yes, correct.  We had to treat it well, yes.
16     Q  When you were operating a bus, what rules or
17 regulations or laws governed you?
18     A  You mean driving the bus, or how?
19     Q  Yes, ma'am.
20     A  Well, there was a lot of rules.
21     Q  And --
22     A  Oh.  There was -- we had to -- as far as driving, we
23 had to check the rearview mirrors, the one -- the one in the
24 middle, both on the sides.  We had to check as to when we
25 would pick up and drop off children.

### Page 11

1      Q  That was probably the most open-ended question I
2  ever asked.  Let me -- let me get more specific.  Were there a
3  group of laws?  For example, the Texas Department of
4  Transportation has regular motor vehicle laws.  Were there any
5  laws specifically governing bus drivers?
6      A  To be a bus driver, we have to pass the CDL exam,
7  that's the main one, and then, afterwards, go to certified
8  classes.
9      Q  Okay.
10     A  To be able to drive the big bus, we also had to have
11 that certification.
12     Q  Okay.  Okay.  In your responsibilities, where would
13 you categorize your responsibility to keep the students safe?
14     A  How would I categorize it?  The maximum one.  I
15 always tried to have them very safe.
16     Q  Okay.  During your time as a bus driver, whether it
17 was the nine years that that was your only job or during the
18 period when you were both a bus driver and a cafeteria worker,
19 were you ever reprimanded by any of your supervisors for your
20 performance as a bus driver?
21     A  Reprimanded in what manner?
22     Q  For failing to follow a rule or exceeding a speed
23 limit, getting in an accident, anything like that.
24     A  No, never.
25     Q  Okay.  Is there a -- is there a procedure for a bus

### Page 12

1  driver to object to policies or procedure, a grievance
2  procedure, for example?
3      A  Yes, there are procedures.
4      Q  Okay.  Can you explain to me to the best of your
5  knowledge what that procedure consists of?
6      A  Well, first we talked to the supervisor.
7      Q  Okay.
8      A  And if it was beyond his area, then we would file a
9  grievance, level 1, and after that 2 and 3.
10     Q  Okay.  During your time as a bus driver, did you
11 feel you could file a grievance?
12     A  Well, yes.
13     Q  Did you ever?
14     A  Well, yes, with this case.
15     Q  Okay.  Before this case, did you ever file one?
16     A  No.  No.
17     Q  Does that mean you were happy with the way things
18 were?
19     A  Well, before, I was.
20     Q  Okay.  During your time as bus driver there with
21 Los Fresnos, did you consider yourself to be a loyal employee?
22     A  Yes.
23     Q  And in what way were you loyal?
24     A  Well, I did all my duties that I had to do, to
25 perform.

### Page 13

1      Q  Okay.  And, in that respect, you would consider
2  yourself dedicated?
3      A  Yes.
4      Q  Okay.  And hard-working?
5      A  Yes.
6      Q  How often would you think you missed work?
7      A  Well, when I would feel ill, when I was sick.
8      Q  Okay.  What I'd like to do is, I'm gonna kind of go
9  through your lawsuit, your written lawsuit, and, then, this
10 way, I can try to ascertain the facts from you that support
11 your lawsuit.
12     A  Okay.
13     Q  Have you had an opportunity to read your lawsuit?
14     A  Yes.
15     Q  Okay.  In your lawsuit, you claim that you became
16 the target of political retaliation; is that correct?
17     A  I didn't understand that well.
18     Q  Okay.  Basically, that because of your involvement
19 in politics, my client in some form, either by a supervisor or
20 an employee, retaliated against you.  Okay?  Do you know what
21 it means to be retaliated against?
22     MR. PRUNEDA:  Maybe we're not -- is that the
23 proper translation?  I've never heard that.
24     INTERPRETER:  Desquitar, represalia --
25     A  Like revenge, something like that?

Page 14

1       MS. BARRERA: I'm gonna stay on the record, but
2   I'm going to defer to Counsel to advise your client on
3   "retaliation"
4       MR. PRUNEDA: I have no idea how I would say it
5   in Spanish. I don't know what the proper translation is.
6       MS. BARRERA: You want to tell -- you want to
7   tell her in English so that he can translate, maybe?
8       INTERPRETER: I have a Spanish dictionary here.
9   Well, I guess she doesn't understand the word, that's why.
10      Q (Ms. Barrera) Let me try it this way. Retaliation
11  means that they take some negative action towards you. Okay?
12  They respond to your exercise of politics, in general, in some
13  form that you perceive to be punishment or negative. Okay?
14  Are you understanding now what I mean?
15      A Okay, yes.
16      Q Okay. So, I'm going to go slowly and I'm going to
17  ask you, in what way did you participate in politics?
18      A Well, I was part of a -- of the union and I liked to
19  -- how can I say this? When there was a problem, I liked to
20  talk and be able to fix the problem.
21      Q Okay. What union did you belong to?
22      A Firstly, we were part of the 100 from Corpus, and
23  then in Brownsville they opened up a new union from the
24  district of Brownsville and from the district of Los Fresnos,
25  Los Fresnos, yes; and I don't know more, because when I

Page 15

1   started this case the union didn't want to help me anymore.
2   So, I had to go and get a private attorney; and, if they
3   continued or not, I don't know.
4       Q Okay. How long were you a member of the union?
5       A I don't know exactly how many years, but there were
6   several.
7       Q So, if I said more than two years would that --
8       A (In English) Yes.
9       (By the Interpreter) More than two years, yes.
10      Q Okay. More than five?
11      A Yes.
12      Q Did you have a membership card?
13      A No, they wouldn't give us a card.
14      Q Did you pay dues?
15      A Yes.
16      Q And how much were your dues?
17      A They would withhold from us around $13 from the
18  check.
19      Q Every month or every pay period?
20      A Every month.
21      Q Okay. And who was the president of your local union
22  when you were terminated?
23      A Marcial -- I do not remember his last name.
24      Q Okay.
25      A Marcial --

Page 16

1       Q Did you ever hold a position with the union besides
2   just a member?
3       A I was just a member.
4       Q And what was the exact name of the union?
5       A I don't know. Since it was a new union, I --
6   truthfully, I don't remember.
7       Q How long was it -- or how long had it been new, how
8   long had it been in existence?
9       A When I started with this problem, it must've been
10  for one year. It had one year.
11      Q Did you receive literature from your union?
12      A No.
13      Q Did you go to meetings?
14      A I would.
15      Q And when were the meetings?
16      A Not frequent. It was every once in a while. They
17  weren't frequent.
18      Q Okay. Can you give me a better idea of what "not so
19  frequent" means?
20      A Well, we thought that it could be once a month, but
21  sometimes two or three months would go by and there was no
22  meeting.
23      Q Okay. And did you always attend the meetings when
24  they did happen?
25      A Yes.

Page 17

1       Q Okay. What type of goals did the local union have?
2       A Well, to help the workers, those who worked in
3   maintenance, cafeteria and transportation.
4       Q Okay.
5       A And help them to receive fair treatment and more
6   work hours.
7       Q And what type of role did you play in that? What --
8   can you give me an example of one goal that you guys had and
9   the action you took to achieve that goal?
10      A You mean in the union?
11      Q Uh-huh.
12      A Well, the main goal was for us to receive work
13  hours.
14      Q Okay. And how did you try to get more work hours?
15      A Well, we would talk there in the union with the
16  president and they would try to send letters to the school so
17  that they could help us out with this problem.
18      Q Okay. Did this union have collective bargaining
19  rights, do you know?
20      A No, I don't know.
21      Q So, they might have, but you don't know?
22      A I don't know.
23      Q Okay. Aside from talking to the president of the
24  union, what did you do in an attempt to achieve that goal?
25      A Related as far as the group goes or what I would do,

**November 30, 2001**

**Miriam Martinez**
**v. Los Fresnos Consolidated I.S.D.**

1  me, myself?
2    Q  Both.
3    A  Well, we would talk to the supervisor. Sometimes we
4  would talk to the supervisor.
5    Q  Okay. And was this Mr. Gonzalez or Rocillo or --
6    A  This last time it was Mr. Gonzalez.
7    Q  Okay. And were you there?
8    A  When?
9    Q  When you talked to Mr. Gonzalez.
10    A  When I would talk to him?
11    Q  Or when the group talked to him.
12    A  Well, sometimes we would get together with him. We
13  would have in-service and we would talk in groups with him.
14    Q  Okay. Well, aside from in-service -- because
15  in-service is something that the district does in and of
16  itself with its employees, correct?
17    A  Yes.
18    Q  Did the group, the union, did you ever have a
19  meeting that you called and had your supervisor come to in
20  order to discuss this goal?
21    A  No.
22    Q  Okay. So, aside from being a member of a union, can
23  you tell me any specific acts that you did that you felt were
24  a reason they fired you?
25    A  Well, Mr. Gonzalez started to cut hours from us and

1  he started placing new people in positions that were
2  supposedly saved for those who had more seniority.
3    Q  Okay. And -- I'm sorry. Go ahead.
4    A  So, that's when I called Channel 4 and I called them
5  over so that he could visit us so that they could shed light
6  out there so that everyone could see what they were doing to
7  us.
8    Q  Okay. When was that?
9    A  It was like in November of '98, around there.
10    Q  Okay. So, it was -- November, December, January,
11  February, March, April, May. It was six months before the
12  May, '99, incident, correct?
13    A  Yes, more or less.
14    Q  Okay. In that occasion where you invited Channel 4,
15  had you ever contacted the media before?
16    A  No.
17    Q  Okay. So, this was the first time?
18    A  Yes.
19    Q  Okay. Were there any times after that?
20    A  No.
21    Q  Okay. Okay. Now, you told me -- and what you told
22  me is the retaliation part. That's retaliation, that you're
23  saying he cut hours, he gave other people, new people the
24  places and stuff. That's -- that's kind of retaliation.
25  That's the idea of it.

1    A  Okay.
2    Q  Now what I want to try to figure out is, what do you
3  think made him do those things?
4    A  Well, what I think is that he didn't like for -- for
5  someone to put him in a bad position in front of other people.
6    Q  And that would be the occasion you reference in some
7  of your -- in some of your responses about having to
8  apologize, or was that Mr. Cisneros?
9    A  Oh, no. That was a separate thing.
10    Q  So, you think what motivated Mr. Gonzalez was that
11  he didn't like people to make him look bad?
12    A  Well, yes, because he didn't like for me to tell him
13  the truth as to what was going on in the bus barn.
14    Q  And what was going on in the bus barn?
15    A  Well, what I told you, that he was deducting hours
16  and that he was giving the hours to those who had recently
17  gotten there, and those of us who had seniority, well, he
18  would take them away from us.
19    Q  So, he cut hours. Then, you came and said, "You
20  shouldn't be cutting the hours." Is that how it happened?
21    A  No.
22    Q  No. Okay. Then, you tell me how it happened.
23    A  What -- how what happened?
24    Q  Well, this is my understanding. So, you -- you
25  correct me when I tell you when it's wrong. Okay? Is that he

1  -- he cut the hours or he didn't treat the people with
2  seniority correctly; and, so, then you went to Mr. Gonzalez
3  and told him, you know, "This isn't right," and then he didn't
4  -- he didn't do what he should've done, in your opinion, so
5  you called Channel 4; is that correct?
6    A  Well, yes.
7    Q  Okay. Before he cut the hours -- okay? And that's
8  real important. Before he cut the hours, had you done
9  anything, been voicing discontent, been doing anything like
10  that politically?
11    A  Having told him?
12    Q  Yeah, before, before he actually gave you the
13  reason, before he actually cut the hours.
14    A  It's because he started cutting hours little by
15  little without anybody finding out, until we finally found out
16  that they were little by little trying to -- taking away our
17  hours. So, we all got together in one of the meetings that he
18  does and we talked. Each and every one of us voiced his or
19  her opinion.
20    Q  So, everyone was telling him?
21    A  Yes.
22    Q  Okay. Now, tell me again why you think he cut the
23  hours little by little.
24      MR. PRUNEDA: Objection. I'm going to object
25  to the form. Calls for speculation.

Page 22

1  (MS. Barrera ) I'm going to qualify that. Because
2  you brought a political retaliation claim, your belief s
3  paramount to your opinion as to the motivation of the action
4  by the employer.
5      INTERPRETER: Is paramount as to what else?
6      MS. BARRERA: Is paramount as to her belief of
7  the motivation.
8      MR. PRUNEDA: And I'll respond by saying -- by
9  stating that those -- that question relates to a fact that
10 occurred prior to the retaliation and not to the actual
11 retaliation.
12 Q  (Ms. Barrera ) And you can go ahead and answer now.
13 A  Can you repeat the question?
14 Q  Sure. What do you believe, subject to your
15 attorney's objection, motivated Mr. Gonzalez to cut hours?
16 A  Oh, I don't know that.
17 Q  Okay. Okay. So, aside -- okay. Is the only
18 retaliation, then, you're claiming is that you were fired?
19 A  Well, yes.
20 Q  So, there was nothing before that they did to you?
21 A  Before Gonzalez, no.
22 Q  Okay. Before you were terminated.
23 A  Before being fired if I had another occasion to --
24 Q  To grieve something that they did to you.
25 A  No, only that they took me out unjustly. That's

Page 23

1  all.
2  Q  Okay. So, they never -- they never cut your pay
3  rate?
4  A  Cut the salary? In other words --
5  Q  Lowered your pay rate.
6  A  Well, the salary, they wouldn't reduce my salary.
7  What they would do is that they wouldn't give me enough hours.
8  Q  But they were doing that to all the other employees,
9  too, correct?
10 A  Yes. The only thing there was that they would give
11 preference as to one group over another.
12 Q  Okay. Which group got preference?
13 A  Well, almost always those that would get there in
14 the -- in the end.
15 Q  Okay. The newer employees got more hours?
16 A  Right.
17 Q  Okay. Were any of those employees members of the
18 union?
19 A  Hardly, no.
20 Q  Okay. Were there any?
21 A  I'd have to say one or two or three, that's it.
22 Very little.
23 Q  And how big a group are we talking about?
24 A  The union ones?
25 Q  No, the ones that got preferential treatment.

Page 24

1  A  I'd have to say I can't say the exact number.
2  Q  Understood. But the best guess?
3  A  I'd say around ten.
4  Q  Okay. So, maybe between one and three out of those
5  ten were members of the union?
6  A  More or less.
7  Q  Okay.
8  A  (By the Interpreter) I wrote a letter with all
9  these, with all these things that we wanted, about the hours,
10 about them reducing our hours and not giving us enough trips.
11     (In English) I make a letter.
12     (By the Interpreter) I made a letter and about 20
13 drivers signed it.
14 Q  Okay. Would that be called a petition?
15 A  Like a petition.
16 Q  Okay. And when was that?
17 A  I don't remember, but it was before that this
18 problem of mine happened.
19 Q  In '98 or '99?
20 A  After -- towards the end of '98/beginning of '99,
21 after Channel 4 went there, more or less.
22 Q  Okay.
23 A  And Gonzalez did not like that letter.
24 Q  Okay. Do you think that's why you were fired?
25 A  Well, for that reason, and for the reason that I

Page 25

1  always tried to talk and -- and say what -- expose, you know,
2  things that are wrong, and for talking and, yes, sending those
3  letters. That's why I think he fired me.
4  Q  And do you think that -- when, when would you speak
5  out?
6  A  Well, when we had sometimes our meetings.
7  Q  Okay. Outside of the union meetings --
8  A  No, in the meetings, the in-service that we had with
9  the supervisors.
10 Q  Okay. And did other employees speak out, as well?
11 A  Yes, the same. A group of us were always talking
12 about the same thing.
13 Q  Okay. And how many people signed that petition?
14 A  It was around 23 or 25, more or less.
15 Q  Okay. And out of those 23 or 25 people that signed
16 it, what, if anything, negative happened to them?
17 A  Well, one of them -- well, not just one of them, but
18 three of the ones that did that, they also had to leave
19 because they were making their lives miserable there. They
20 were deducting hours from them. They wouldn't give them any
21 trips.
22 Q  And who were those three people?
23 A  Well, three of the drivers that -- three of us
24 drivers of the drivers that were working there.
25 Q  Okay. And can you tell me the names of those three

## Page 26

1  drivers that were working there with you?
2  A  One of them is Leonila Sanchez. The other one has a
3  last name of Vidal, but I don't remember his or her name.
4  Q  That's okay.
5  A  And the other one I don't remember. I'm forgetting
6  the names. I can't give you the name.
7  Q  Okay. What I'm going to do is I'm going to ask the
8  court reporter to leave a blank line there, and when you have
9  an opportunity to go back and review your deposition with your
10  attorney, if you remember the name you can go ahead and put it
11  in. Okay?
12  A  Correct. (Information requested: _____.)
13  Q  Okay. And, by the same token, if you don't
14  remember, it's okay.
15      Okay. If you had to try to go back and figure
16  out when, when the retaliation started, when the negative
17  treatment toward you started, when would that be?
18  A  Well, exactly, I can't give you the time frame, but
19  it was after Gonzalez started working there as a supervisor.
20  Q  Did you like Mr. Gonzalez?
21  A  Okay. Well, we never had the chance to get to
22  better acquaint ourselves with him, and it was due to the fact
23  that he wanted to impose his -- what he wanted, his -- his --
24  you know, what he wanted. He wasn't friendly. And it wasn't
25  that I didn't like him. It's not that I didn't like him.

## Page 27

1  It's just that I didn't like the things that he was doing at
2  the bus barn.
3  Q  The things he -- he was doing, you didn't like them,
4  but were they within his supervisory powers?
5  A  Well, yes.
6  Q  Okay. Aside from Mr. Gonzalez, was there anyone
7  else in the district that you felt took negative action
8  towards you?
9  A  Well, Mr. Cisneros. He was the one that accompanied
10  me during the trip where I had that incident.
11  Q  But he's not your supervisor, is he?
12  A  No.
13  Q  Okay. Who has the ability to fire you?
14  A  Well, the supervisor is the one that gives the idea,
15  is what I say, but the one who goes and fires is
16  Mrs. Hinojosa, Fidela Hinojosa.
17  Q  And when you say, "gives the idea," so that I don't
18  put words in your mouth, does that mean he makes the
19  recommendation?
20  A  Yes. He's the one that says or writes, "I don't
21  like this person," and he passes that on to Fidela Hinojosa
22  and she's the one who does the firing.
23  Q  And what is her position?
24  A  I don't remember the name, his name -- I mean, the
25  title that she would hold, but -- 'cause I don't remember it,

## Page 28

1  but she would hold a title that was after the superintendent,
2  Mr. Ruiz.
3  Q  Okay. Did Ms. Hinojosa retaliate against you in
4  some way?
5  A  No, not her.
6  Q  Okay. In your petition, you talk about -- and if
7  you'd like to see this, you're more than welcome to see it.
8  So that you're not speaking from recollection, if you want to
9  look at it I can give it to you. Would you like a copy of
10  your petition?
11  A  Okay.
12  Q  You might have it.
13  A  Is it this one?
14  Q  Is that it? Mr. Grissom made a copy of mine this
15  morning.
16  A  (In English) Plaintiff's Original Petition. I
17  think it's the same. No?
18  A  No, it's the first amended.
19  A  (In English) Oh, okay.
20      MS. BARRERA: You want to make sure that's a
21  complete copy so that I can ask your clients some questions
22  about it? Here's another copy. This is Mr. Grissom's copy
23  right here.
24  Q  (Ms. Barrera) Here, you take this one and I'm going
25  to swipe this one. If you turn to the second page, if you'll

## Page 29

1  look at the second paragraph, the second full paragraph,
2  there's a sentence that starts with, "However." Okay. That
3  sentence: However, those who challenged current
4  officeholders, opposed certain practices, were non-political
5  or failed to bolster political allies were subjected to
6  negative treatment, coercion and were less likely to advance.
7      Do you agree that that's what that states?
8  A  I don't understand that. I don't understand what
9  the idea there is.
10  Q  Okay. Well, I'm trying to find out who "those" are.
11  I'd like to know who those people are that challenged and were
12  subjected to that negative treatment.
13  A  (By the Interpreter) I don't understand.
14      (In English) I'm sorry.
15      (By the Interpreter) Who, who was it that treated
16  us bad?
17  Q  No. Who were the people that got treated badly?
18  Can you give me any names?
19  A  Treated wrongly, but those who worked with me?
20  Q  Yes, ma'am.
21  A  I can give you several names of people who worked
22  with me, 'cause two of them already left.
23  Q  And who were those people?
24  A  Leonila Sanchez was one of them. Vidal was the
25  other.

Page 30

1  Q  Okay. And who were the -- who were the
2  officeholders that they challenged?
3  A  For those that worked in the offices?
4  Q  Supervisors or whoever that they were expressing
5  concern to.
6  A  (No response.)
7  Q  If you don't know, that's okay.
8  A  No, I can't answer. I don't know.
9  Q  Okay. Is it because you don't understand what's in
10  there?
11  A  (In English) I don't understand.
12     (By the Interpreter) No.
13  Q  Okay. Let's -- let's move on, then. The next
14  paragraph -- well, let me ask you this. Do you -- do you read
15  English, Ms. Martinez?
16  A  (In English) I read English, but --
17     (By the Interpreter) There's too much -- too many
18  things that are together and I can't get the idea. When
19  there's too many words, I can't get the idea.
20  Q  Okay. Okay. The next paragraph, okay, the next
21  sentence, we're talking, the Plaintiff, that's you. Do you
22  understand that?
23  A  Okay.
24  Q  Okay. Then, it says, "on many occasions." Okay?
25  So, that means on several times. Okay? You opposed the

Page 31

1  preferential treatment. Okay. You opposed that other people
2  were being treated differently than other bus drivers, and
3  we --
4  A  Yes.
5  Q  We talked about the hours. Okay. What else? Is
6  there anything else?
7  A  Well, the trips, about the trips. The newer ones
8  would get the extra trips.
9  Q  Okay. And that amounts to more hours?
10  A  More hours.
11  Q  Okay. And more money?
12  A  Well, yes.
13  Q  Okay. Aside from anything to do with hours, was
14  there something else?
15  A  Well, sometimes also those new people would also be
16  given the newer busses.
17  Q  Okay. Tell me about the building. Tell me about
18  people being allowed in the building. Who was allowed in the
19  building? Are we talking about the bus barn?
20  A  Yes, the bus barn.
21  Q  Okay. Who -- if everything was done correctly, who
22  would've been allowed in the bus barn?
23  A  Well, the bus barn is an open place.
24  Q  Okay.
25  A  We have the office where we also have the bathrooms

Page 32

1  and all, and Mr. Gonzalez gave an order saying that nobody
2  should enter to the office by using the front door.
3  Q  Okay. I'm going to stop you there. When you say
4  say he gave an order, was it on paper or verbal?
5  A  No, he talked about it during a meeting.
6  Q  Okay.
7  A  So, we had to go through a backdoor. We had to
8  circle all around the building and go inside through a
9  backdoor.
10  Q  And it was a big pain?
11  A  It's because it's -- it's not that it was hard.
12  It's just that it was just a floor there, and when it would
13  rain or if there was bad weather, we would have to walk there
14  and it was real muddy.
15  Q  So, it was like ground; it wasn't a sidewalk?
16  A  No, it was dirt.
17  Q  Okay.
18  A  But the problem was that they would all -- they
19  would make us all go through that backdoor, but then there was
20  a group of drivers whom he would let go through that front
21  door.
22     INTERPRETER: "whom would go through that front
23  door." Excuse me.
24  Q  (Ms. Barrera) Okay. And who were those people, do
25  you remember their names?

Page 33

1  A  One of the names was Teresa Morua.
2  Q  Do you know how to spell that?
3  A  (In English) Morua is M-O-R-U-A.
4     MS. BARRERA: As much for my benefit as yours.
5     COURT REPORTER: Thank you.
6  A  The other one was Miriam Vara. And, Martinez, I
7  don't remember his or her last name -- his. He.
8  Q  (Ms. Barrera) Okay. And why did they get to go
9  through the front door?
10  A  I don't know.
11  Q  Were they friends with Mr. Gonzalez?
12  A  Well, maybe so. And those were the things that we
13  didn't like, why they let somebody do some things and us they
14  wouldn't.
15  Q  Okay. Tell me about punching out. What is the rule
16  about punching out?
17  A  Well, each and every one of us had to punch out 15
18  minutes early before the bus leaving; and, then, when we would
19  get back, 15 minutes afterwards so that we could clean the
20  bus.
21  Q  Okay. Tell me what the problem was dealing with
22  punching out.
23  A  Well, the problem was that some people would come
24  and punch in and they still had half an hour.
25  Q  So, they were getting more time?

**Page 34**

1  A   Well yes.
2  Q   Who were those people, can you give me their names?
3  A   One of them had the last name of Garcia. It's
4 because a lot of the people we knew them by their last name
5 and not by their first name.
6  Q   That's okay. That's okay. Okay. Why did those
7 people, Garcia and whoever else, why did they get to punch in
8 early, do you know?
9  A   For more money.
10  Q   Do you know, why -- why didn't Mr. Gonzalez get
11 after them?
12  A   No. They're groups of people who would be -- would
13 become great friends with the boss. That's what I think.
14  Q   Okay. Okay. I'm going to talk to you a little bit
15 now about the more specific claims in your lawsuit. The First
16 Amendment to the Constitution of the United States of America,
17 do you know what the First Amendment is?
18  A   I don't remember it.
19  Q   Okay. The First Amendment to the Constitution gives
20 you your right to speak out freely, to associate or not
21 associate with any political group. It is what gives you your
22 right, literally, to be an individual, to not be oppressed or
23 treated badly because you choose your own course. Okay? What
24 did the district do through its employees or its agents that
25 did not allow you to speak freely?

**Page 35**

1  A   What is it that they did? Well, what I think that
2 they did was to get me out, because they didn't want me to
3 talk. So, they got me out.
4  Q   Before they terminated you, had they done anything
5 to try to keep you from voicing your -- your opinion?
6  A   For me not to talk? They never told me anything.
7  Q   Okay. What about in terms of being able to be a
8 member of the union? Okay? Did they try to keep you from
9 being a member of the union somehow?
10  A   No.
11  Q   Okay. How does one attain tenure rights as a bus
12 driver?
13       INTERPRETER: Pardon me?
14       MS. BARRERA: Tenure rights.
15       INTERPRETER: Okay. Tend or ten?
16       MS. BARRERA: Tenure, T-E-N-U-R-E.
17       INTERPRETER: Tenure? Okay. Hmm. Can you
18 think of a synonym for that word, Counsel?
19       MS. BARRERA: It's a pretty technical term
20 that's mostly used with teachers or those who have --
21  A   I don't understand what you're trying to ask me.
22  Q   (Ms. Barrera) Okay. Can you turn the page -- or,
23 no. Let me see. Is there a Section III?
24  A   Uh-huh.
25  Q   Okay. The very last part of it, part of what is

**Page 36**

1 being asserted is that you have not attained tenure rights as
2 a result of unemployment, and I just want to know what those
3 are.
4       MS. BARRERA: Can you point to it for her?
5       INTERPRETER: The last paragraph or C?
6       MS. BARRERA: It would be right here. There
7 you go.
8  Q   (Ms. Barrera) If you don't know what they are,
9 that's okay.
10  A   No, I don't understand.
11  Q   Do you have a contract for employment with the
12 district? Did you have a contract?
13       MS. BARRERA: Strike that.
14  Q   (Ms. Barrera ) At the time of your termination, did
15 you have a contract of employment with the district?
16  A   Yes. Employment, yes.
17  Q   Okay. How long was your contract?
18  A   For that year, in other words, that year that we
19 were going to work.
20  Q   Was it a written contract?
21  A   The truth is I don't remember. It's been so many
22 years that I don't remember the first.
23  Q   Is it possible that you were actually an at-will
24 employee?
25  A   What do you mean, "at-will"?

**Page 37**

1  Q   You didn't have a written contract with them that
2 said they had to keep you employed for one year or else they
3 broke a contract with you?
4  A   Oh, no.
5  Q   Okay. Who was present at the initial meeting when
6 you were terminated?
7  A   When I went to go talk with Gonzalez, with me was
8 Basilio Soto.
9  Q   And he was your union representative?
10  A   Yes.
11  Q   Okay. And who else was there?
12  A   And Sonny was there, the other one who works there
13 or who was working there for Gonzalez. Sonny Basaldua.
14  Q   Basaldua. And anybody else?
15  A   And --
16  Q   Okay.
17  A   No, only four.
18  Q   Okay. Where did the meeting take place?
19  A   In the office, in the bus barn office.
20  Q   Okay. Was there screaming and yelling at that
21 meeting?
22  A   No.
23  Q   Was there a door?
24  A   Yes.
25  Q   Was the door open or closed?

Case 1:01-cv-00095  Document 30   Filed in TXSD on 02/12/2002  Page 20 of 31

Multi-Page

Miriam Martinez
November 30, 2001                                   v. Los Fresnos Consolidated I.S.D.

Page 38

1   A   No, it was closed.
2   Q   Okay. Okay. Do you remember what time the meeting
3   was?
4   A   I don't remember the hour.
5   Q   Okay. After that meeting, can you tell me who the
6   first person you told that you had been terminated, can you
7   tell me who that was?
8   A   I don't remember whom I talked to at that moment.
9   Q   Okay. Did you have to go clean out a locker or
10  anything after that or did you have to just leave the
11  premises?
12  A   That day was when after Gonzalez had told me to go
13  talk to Fidela Hinojosa after I finished my route. He asked
14  for my locker keys and my punching card. But up to that point
15  I still didn't know that I had -- I was fired.
16  Q   Then, why was Mr. Soto with you?
17  A   No. When you asked me if I was cleaning the locker
18  room, that was before.
19  Q   Right. But did you know before you went in to talk
20  with Mr. Gonzalez that you were going to be terminated?
21  A   Okay. When I went to go talk to Gonzalez, I knew
22  that I had already been terminated.
23  Q   How did you know that?
24  A   Because before this, once I had gone out from --
25  finished one of my routes, he told me, "Tomorrow, go talk to

Page 39

1   Hinojosa."
2   Q   Okay.
3   A   "And give me the locker keys and give me your card,
4   your punch card."
5   Q   Okay. So, you kind of knew?
6   A   No, I didn't know anything.
7   Q   Why did you think he was taking your keys from you?
8   A   Because I thought they were going to suspend me for
9   the broken window that happened during the accident.
10  Q   Okay. Do you -- do you think -- and what did you
11  think of that? What did you think if they were going to
12  suspend you?
13  A   Because I thought that since I had broken a window
14  they were going to suspend me.
15  Q   Would it have been legitimate to suspend you for
16  breaking a window?
17  A   I don't think so, because many people would break
18  windows and they wouldn't do anything to them. But since what
19  had happened, considering what had happened --
20  Q   And what had happened?
21  A   Well; because of all the letters I had sent in and
22  of all the objections that I would do, I thought to myself,
23  well, they're gonna make me pay for it.
24  Q   How many letters had you sent in?
25  A   No. Well, that letter, the one -- the one that the

Page 40

1   23 drivers signed.
2   Q   The petition?
3   A   The petition.
4   Q   Okay. Okay. Can you tell me in your own -- in your
5   own way what happened on that trip in --
6   MS. BARRERA: Go ahead.
7   Q   -- in May of '99?
8   A   We were on our way to Corpus.
9   Q   Okay.
10  A   There was two busses and a truck.
11  Q   Okay. And who was driving the busses?
12  A   I was driving the first bus. The second was another
13  female driver.
14  Q   Do you remember who that was?
15  A   I don't remember the name.
16  Q   Okay. Who was driving the truck?
17  A   A man by the name of -- I don't remember. Romidro?
18  Romigio? Remigio?
19  Q   Okay.
20  A   I can't -- I can't think of the names.
21  Q   Okay.
22  A   We were on our way to Corpus, and we must've been
23  driving for an hour or two hours, more or less, when I got a
24  strong, a very strong pain here in the neck.
25  Q   What kind of pain? Was it a stabbing pain or --

Page 41

1   A   Yes, like a stabbing pain, more or less.
2   Q   Was it real strong or was it dull?
3   A   No, real strong.
4   Q   Okay. And then what?
5   A   So, then, after that, I started directing the bus
6   towards the shoulders because I didn't want any problems there
7   on the road and somebody else hitting me hard.
8   Q   Okay. So, you moved the bus onto the shoulder or --
9   A   (In English) On the shoulder.
10  Q   -- you veered onto the shoulder?
11  A   (By the Interpreter) No, I veered it with my hand.
12  I let it go --
13  (In English) Go to, yeah, to the shoulder.
14  (By the Interpreter) To the shoulder. And, then,
15  like five or seven seconds afterwards, I went back to the lane
16  normally.
17  Q   Okay.
18  A   We continued and we got to Corpus to a Whataburger.
19  Q   Okay.
20  A   This Whataburger had a park station that was very
21  little.
22  INTERPRETER: Parking lot.
23  A   (In English) Parking lot.
24  Q   (Ms. Barrera) Okay.
25  A   I went in, the other bus and the other truck, and we

Page 42

1   stopped along the edge and we brought down all the kids and
2   they ate, and, when we were about to leave --
3       Q   You can -- I'll have you draw it on this.
4           MS. BARRERA:   And, before that, I'd like you to
5   mark this
6           (Exhibit 1 marked.)
7       Q   (Ms. Barrera)   Okay.  This is a piece of paper, it's
8   blank, and it's been marked as Deposition Exhibit No. 1; and,
9   so you know, 'cause I don't want -- I'm not trying to trick
10  you.  I'm going to take this after you draw on it.
11          MS. BARRERA (to Interpreter):   Okay?  You want
12  to tell her?
13      Q   (Ms. Barrera)   And I'm going to give it to the court
14  reporter and it's going to become part of your deposition.
15  Okay?  And, so, when you draw this, you're still under oath
16  drawing it.
17      A   (In English   )   Yes.
18      Q   Okay.
19      A   (In English   )   Sure.  Okay.  Let's see.  Okay.  Let's
20  see.  (Witness draws.)
21          (By the Interpreter)   Let's suppose that this is the
22  street right here.
23      Q   Okay.
24      A   Or a highway.  This is where we came in into the
25  Whataburger.  This is the restaurant, Whataburger, right here.

Page 43

1       Q   Okay.
2       A   We went in here and I stopped my bus right here.
3       Q   Can you show me where the front of the bus is and
4   where the back is?
5       A   Right here.
6       Q   Okay.  Looks good to me.  I can't even draw stick
7   people.
8       A   This is the second bus and here's where the truck
9   was at.
10      Q   Okay.  And I'm going to mark this.  Can you mark
11  that bus number 1?
12      A   (In English)   Okay.  My bus.
13      Q   And number 1 is going to be the bus you were
14  driving, correct?
15      A   (In English)   Yeah, I put my bus here.
16      Q   Okay.
17      A   When we were going to leave, there was no exit over
18  here.  The exit was over here, to a street over here.
19      Q   Lot?
20      A   Here there was another lot and some other things
21  that were there.  Right here it was divided by some blocks
22  that they put in the parking lots to divide.
23      Q   The cement blocks?
24      A   (In English)   Cement.
25      Q   So that when someone parks head-in --

Page 44

1       A   Uh-huh.
2       Q   Okay.
3       A   When I made this movement to get out, I was looking
4   out through my mirror to make sure that the tire, my tire, the
5   back tire wouldn't get on top of the block.
6       Q   Okay.
7       A   I didn't -- I didn't want my tire to get on top of
8   the block.  I was avoiding that.
9       Q   Okay.
10      A   But I didn't notice that there was a house here, a
11  tool house, something like that, that where the corner of the
12  roof was out here; and when I did the -- turned the bus like
13  this, one of the windows managed to catch the corner and it
14  cracked.
15      Q   Okay.
16      A   So, I stopped, I reversed and made sure that there
17  were no kids that were injured.  I asked.  So, then,
18  Mr. Cisneros told me, "No, everything is okay."  So, then, I
19  told them, "Move so that you won't be near the glass."
20      Q   Okay.
21      A   So, I moved the bus back here again and we went out,
22  we left.
23      Q   Okay.
24      A   That was on the way over there.
25      Q   Okay.  So, you -- so, the window was broken when you

Page 45

1   were moving forward or when you were moving backward, when you
2   were traveling?
3       A   To the front, forward.
4       Q   Okay.  So, then you went on into Corpus from there;
5   is that correct?
6       A   Uh-huh.
7       Q   Okay.  And, then, what happened?
8       A   On our way back, I drove with another teacher.  We
9   were driving, and in front of us was a small truck.  I
10  remember that it was a red truck and it was driving 40 miles
11  an hour.
12      Q   How did you know it was 40?
13      A   Because I was behind him and I was going 40.  So,
14  then I said, "If we keep -- if I keep on going 40, we're gonna
15  get there later."  So, I tried to pass him.
16      Q   And which lane was he in?
17      A   We were on the right lane.  So, I tried to pass him
18  through the left one.
19      Q   Okay.  Was it just two lanes?
20      A   Yes, two lanes.  As I was passing him, you know,
21  those winds that come all of a sudden, then the bus moved.
22  And, then, I don't know if the teacher got -- got scared or
23  something, but he hit my -- my seat and he said, "Wake up,
24  ma'am."
25      Q   Okay.

Page 46

1   A   And then I asked him what was going on, because I
2  didn't know what had happened. Then, he tells me, "You almost
3  hit the truck."
4   Q   And this is Mr. Cisneros?
5   A   No. another white teacher.
6   Q   You don't know his name?
7   A   I don't know what his name is. To me he was new.
8   Q   Okay.
9   A   So, I asked him, "What happened?" He said, "Well,
10  you almost hit the truck." So, I told him, "No, I'm watching,
11  making sure through the mirrors that I don't hit the truck, I
12  have a little space between." So, I continued and then I got
13  in front of the truck. I got the right lane and I kept on.
14        So, then, afterwards, we got to a restaurant
15  with a gas -- gasoline station there. He asked me to stop
16  there. We stopped, he got down and he went to go talk to the
17  driver behind, and then both went to the gas station. They
18  were there for a little bit and then they came back. The
19  teacher came in and sat down, and then the other driver asked
20  me, "Miriam, are you okay?" I said, "Yes. Why?"
21   Q   Is this the other driver of the other bus?
22   A   The truck driver.
23   Q   So, it'd be -- would it be Remigio Garza?
24   A   Remigio.
25   Q   And then the other driver was Rosalinda Rios?

Page 47

1   A   Rosalinda, yeah, Rosa, Rosalinda.
2   Q   Okay. I want to make sure who was where. So, now,
3  we've got Mr. Garza has come up to your bus?
4   A   He asked me, "Are you doing okay? Do you feel all
5  right?" and I said, "Yes. Why?" and he said, "No, for no
6  reason. It's just, if you want to, I can drive the bus and
7  you can drive the truck," and I said, "No, there's no reason
8  to." And I asked him, "Why do you ask me that?" and he said,
9  "Well, no. It's because the teacher wanted me to drive the
10  bus," and I told him, "First of all, I can't give you the bus
11  because I have no authorization from my supervisor." So,
12  then, he went back to his bus, to his work, and I said, "Okay.
13  Well, let's go."
14        (In English) That's it.
15        (By the Interpreter) That's it.
16   Q   Okay.
17   A   We got back to Los Fresnos.
18   Q   Okay. When they asked you if you were okay, were
19  they concerned or were they angry or what?
20   A   No, they just asked me, "Are you doing okay?" just a
21  normal question.
22   Q   Like, "How ya' doing?"
23   A   Yes. "Do you feel okay?" "Yeah."
24   Q   Okay. All right. When you have the strong pain in
25  your neck, what did you do?

Page 48

1   A   I tried to do myself like this, hard (indicating).
2   Q   Okay. With which hand?
3   A   I don't remember. It was so fast that I can't
4  remember.
5   Q   Do you remember if you took one hand off the
6  steering wheel?
7   A   Yes, I removed it for a little bit, but the truth is
8  I don't remember which hand it was.
9   Q   How fast were you going when that pain came?
10   A   Fifty, 'cause we can't drive faster.
11   Q   Okay. Did you feel you were capable of controlling
12  the bus with just one hand?
13   A   Oh, yes.
14   Q   But we talked about the wind was blowing, right?
15   A   No, that was on our way back. That was when we were
16  on our way back.
17   Q   So, the wind wasn't blowing when you were on your
18  way over there?
19   A   Well, it's not that there was wind. It's just that
20  when we were -- when that happened, that's something that
21  happens all of a sudden.
22   Q   And, to clarify, there were students on the bus,
23  right?
24   A   Oh, yes.
25   Q   Are you supposed to drive a bus on a shoulder?

Page 49

1   A   Well, in an emergency, yes. For example, in my
2  case, in my -- in my deal, if I see that things were getting
3  out of -- were getting ugly, I myself can drive on the
4  shoulder; and, then, if I see that they -- that they -- that
5  they got ugly, then I could stop it.
6   Q   Why didn't you just stop the bus?
7   A   (By the Interpreter) Because that was a thing like
8  that and that's it.
9        (In English) And that's it.
10   Q   Did it scare you?
11   A   Well, it scared me at the moment. It's like if you
12  get a knife and they go like this all of a sudden and that's
13  it. But then, afterwards, nothing happened anymore.
14   Q   But you didn't know if it was going to happen again,
15  did you?
16   A   Well, of course.
17   Q   So, it could've happened again?
18   A   Well, who knows? But that's why I myself decided to
19  go to the shoulder, in case that if it happened to me again in
20  the middle of the street, then it'd be more dangerous.
21   Q   How wide is the shoulder? Was it big enough for the
22  bus?
23   A   Yes. Oh, yes.
24   Q   And what is the purpose of a shoulder?
25   A   Well, for an emergency.

Page 50

1  Q. to stopping in an emergency, correct?
2  A  Well, yes. Yes, for an emergency, naturally.
3  Q  But you weren't stopping, correct?
4  A  No.
5  Q  You were just driving over there?
6  A  (Witness indicates yes.)
7  Q  Okay. Are there any rules that govern whether or
8  not you should keep both hands on the wheel when you're
9  driving?
10  A  Well, all driving books that one studies state that
11  you have to have both hands on the driving wheel. It's
12  naturally that they do.
13  Q  When you pulled that bus over to that shoulder to
14  drive on the shoulder, it was because you didn't know if maybe
15  something bad was going to happen?
16  A  No. When I went to the shoulder on the bus, I
17  preferred to be on the shoulder than on the -- in the middle
18  of the street because in case something bad were to happen I
19  could have more control of the bus in the shoulder, and that
20  way not allow for anything or to have the children safer.
21  Q  Wouldn't it have been safer to just stop the bus if
22  you were having a sharp stabbing pain?
23  A  No, I didn't say -- I didn't say that I had a strong
24  pain. I said that it was an all-of-a-sudden pain. If I had
25  had a strong pain, I would have -- it would have been

Page 51

1  different. I would have stopped the bus.
2  Q  But it was a strong enough pain to make you go over
3  to the shoulder, correct?
4  A  Well, yes. I put it on the shoulder because I told
5  myself if it's going to continue, well, it's better to be
6  here.
7  Q  Why didn't you think if it's going to continue it's
8  better to just be stopped?
9  A  I'm going -- I thought, and I'm going to repeat
10  this, it was a -- at that moment it wasn't a pain that lasted
11  three or even four or even five seconds. It was just a pain
12  that lasted just all of a sudden, like that. So, then I told
13  myself why am I gonna stop the bus? If I see that the pain
14  continues, then I will stop it.
15  Q  Okay.
16  A  But it didn't continue. So, I took my lane and I
17  continued.
18  Q  Okay. When you were at the Whataburger parking lot,
19  did you ever get out and look around your bus for any
20  dangerous things?
21  A  Well, we did get out and we -- we were looking to
22  see where we had parked at and we did see these cement blocks
23  there, but I did not notice, I did not see this -- this little
24  corner right there.
25  Q  Did you see the shed?

Page 52

1  A  I saw that there was a shed there, but I didn't see
2  the roof.
3  Q  Why not? I mean, was there some --
4  A  Because I didn't see it.
5  Q  Go ahead.
6  A  Because I didn't see it.
7  Q  Was there something blocking your view?
8  A  I don't -- I don't think so. I don't -- I know that
9  there were some plants there, but I don't think there was a
10  plant in front there. I don't know.
11  Q  It was just you just didn't notice it?
12  A  No, it's just that I didn't see it.
13  Q  Okay. How much glass went into the bus?
14  A  Well, the window, from the window, the bottom part
15  of the window.
16  Q  Okay. Did the whole window break or just part of
17  it?
18  A  The bottom part, the one that goes up and down.
19  Q  Okay. Were there students sitting by that window?
20  A  Yes, there were.
21  Q  But they weren't hurt?
22  A  No, none, because that window when it breaks, it
23  doesn't explode. It just keeps on falling down. It cracks.
24  Q  Okay. What was the basis of your worker's comp
25  claim that you filed?

Page 53

1  A  I don't know what you're trying to say with that.
2  What's the question?
3  Q  At some point you filed a worker's comp claim with
4  Los Fresnos, correct?
5  A  Oh, yes, several years ago. I don't remember what
6  year it was.
7  Q  So, it was a long time ago?
8  A  Yes. It must be five or four years ago. I don't
9  know exactly. Three years ago? I can't remember.
10  Q  Okay. I'm gonna ask you a little bit now about
11  medical providers. Okay? Dr. Chapanos, what did you see him
12  for?
13  A  Oh. That was the time that I wanted to stand up
14  there at the bus and I had a pain here in the back.
15  Q  Was he a chiropractor or a doctor?
16  A  He was a doctor.
17  Q  And Dr. Lopez?
18  A  He was general medicine, general practice there at
19  the clinic.
20  Q  And you just saw him for various things?
21  A  No, not Lopez. It was just that one time about the
22  back, and I think it was Lopez.
23  Q  Okay. And Dr. Novva, N-O-V-V-A?
24  A  I don't remember what Dr. -- what I went to go see
25  that doctor for.

Page 54

1  Q  Okay.  And Dr. Utturkar?
2  A  I don't know who that is.
3  Q  You don't know who that is?  Dr. Pisharodi?
4  A  I believe that Pisharodi and Chapanos work together,
5  I believe.
6  Q  At the San Benito Medical Association?
7  A  I don't know.
8  Q  Okay  Do you remember doing interrogatories?  Do
9  you know what interrogatories are?
10  A  That I had made interrogatories?
11  Q  That I sent you interrogatories.  Do you know?
12  A  (Witness indicates no.)
13  Q  What about requests for admissions?  Do you know
14  what I'm talking about?
15  A  No, I don't know anything about that.
16        MS. BARRERA:  Okay.  May I have this marked,
17  please?
18        (Exhibit 2 marked.)
19  Q  (Ms. Barrera)  Okay.  Do you know what that is right
20  there?
21  A  Oh, the notary public?  Uh-huh.
22  Q  Can you tell me why you signed that piece of paper
23  that's been marked as Deposition Exhibit No. 2?  It's a
24  verification.
25  A  Yes, I did sign this one.  Yes, I did sign this one.

Page 55

1  Q  What was it for?
2  A  Many things that I don't remember.
3  Q  Can you tell me the circumstances by which you
4  signed that piece of paper, Ms. Martinez?
5  A  I signed this not so long ago as far as I can
6  remember.
7        MS. BARRERA:  I think it's "Oh, God."
8        INTERPRETER:  "Oh, God."
9  Q  (Ms. Barrera)  I know it's in English.  So, do you
10  recall anyone taking that document and reading it to you in
11  Spanish?
12  A  Yes.  He's the one that was reading it.  He
13  understands English better and then he explains it to me in
14  better words.
15  Q  Who?  Were you pointing to your attorney or your
16  husband?  Your husband?
17  A  (Witness indicates yes.)
18  Q  Okay.  Do you remember if that verification came
19  with any documents or did you go pick it up, or how did you
20  come in contact with that document?
21  A  This paper?  Through the lawyer.
22  Q  In the mail?
23  A  Yes, he sent it through the mail.  But I signed
24  another paper, too.  I don't remember.
25  Q  Okay.  Did it come with a lot of papers or just a

Page 56

1  couple of papers?
2  A  Okay.  He sent these through the mail and told me so
3  that I could send it back to him right away through the mail.
4  I believe it was this one.
5        MS. BARRERA:  Okay.  Now I'm going to have this
6  marked, and I'm going to staple it because it's a single
7  exhibit.
8        (Exhibit 3 marked.)
9        MS. BARRERA:  Okay.  You want to check this?
10        MR. PRUNEDA:  No.
11  Q  (Ms. Barrera)  Okay.  Can you tell me if you've ever
12  seen these before?  What's been marked as Deposition Exhibit
13  No. 3 are what are called interrogatories and request for
14  production, and these are questions that I sent to you.  Okay?
15  I want to ask you about the answers to those questions and I
16  need to know whether or not you answered those questions.
17  Okay?
18  A  Yes.  I went to a restaurant and answered these
19  questions.
20  Q  Okay.  Question by question.  I need that because I
21  can't ask you about them if you didn't answer them.  Okay.
22  Some of these interrogatories I'm going to try to get more
23  information from you.
24  A  Okay.
25  Q  Okay.  In particular, the one about the medical

Page 57

1  providers, and that would've been that question that's No. 5.
2  Okay.  Do you see those doctors that are listed there?  I'm
3  trying to find out what you saw them for.
4        INTERPRETER:  Can we take -- the interpreter
5  requests a break.
6        MS. BARRERA:  Sure.  Okay.
7        INTERPRETER:  I need to call because I need to
8  be replaced at 1 o'clock because I need to go to Port -- to
9  Padre Island, Port Isabel.
10        MS. BARRERA:  Okay.  We can go off the record.
11        (Off the record from 12:27 p.m. to 12:34 p.m.)
12  Q  (Ms. Barrera)  Okay.  So, on the interrogatories, we
13  were talking about Interrogatory No. 5.  Do you remember why
14  you saw those doctors?
15  A  Dr. Pedro Chapanos, I saw him because of the problem
16  in my back.  Then, he sent me to Pisharodi.
17  Q  Okay.
18  A  Dr. Lopez --
19  Q  You said you saw him one time?
20  A  Yes, I saw him one time.  I don't remember what it
21  was for.
22  Q  Okay.
23  A  Dr. Prasad Novva, I don't know him; and Dr. Anant,
24  I believe he was the one who read the X-rays that Pisharodi
25  performed on me.  But I don't know who that Novva is.

Page 58

1  Q  Okay. Who is your family doctor?
2  A  Dr. Simon. He works in the San Benito Medical
3  Association.
4  Q  What's his last name?
5  A  Simon.
6  Q  Why isn't his name on here?
7  A  (In English) I don't know.
8    (By the Interpreter) I don't know.
9  Q  Is he the one who treats you for your high blood
10 pressure?
11 A  No. When they found out about my high blood
12 pressure was when they performed a general checkup on all the
13 bus drivers, and that was Lopez, Lopez, now that I remember.
14 Q  Okay. And have you seen anyone to treat your blood
15 pressure since?
16 A  Yes, with Dr. Simon.
17 Q  Can you spell his last name?
18 A  (In English) S-I-M-M-O-N-S, I think.
19   (By the Interpreter) It's S-I-M-M-O-N-S.
20 Q  And did he put you on medicine for your blood
21 pressure?
22 A  He prescribed to me some medication because I -- I
23 took it very little because I controlled it right away. So, I
24 didn't continue with it.
25 Q  Okay. So, just a short amount of time?

Page 59

1  A  Yes. I don't even think it lasted for a month.
2  Q  Okay. And have you seen anyone for any type of
3 counseling or anything?
4  A  No.
5  Q  Do you -- do you feel like you need to see a
6 counselor?
7  A  With a counselor? No, I don't think so.
8  Q  You don't feel depressed over what happened?
9  A  I feel a little bit depressed for what happened, but
10 I don't feel that much depressed as to go to seek a counselor.
11 Q  What do you do when you feel depressed?
12 A  Pray and read my Bible.
13 Q  I understand. Okay. Do you remember when you got
14 diagnosed with high blood pressure or when they caught it?
15 A  I don't remember when we went to go get the checkup.
16 Q  Okay. I want to ask you -- it's here somewhere.
17 It's either here or it's in your petition. Did you ever feel
18 like your work was closely scrutinized?
19 A  Someone from work that -- you mean that's watching
20 over me?
21 Q  Too closely, watching you very closely.
22 A  I don't believe so. I don't feel so.
23 Q  Who is Leonila Sanchez?
24 A  She's the other worker that between her and I called
25 Channel 4, but she had to leave the job.

Page 60

1  Q  Did she think you were like a leader of the union?
2  A  No, just a person that would try to help me and
3 other co-workers, not a leader.
4  Q  Did anyone there think of you as a leader?
5  A  Well, I don't know. I never asked anybody, but they
6 would talk to me about the problems that there were at the bus
7 barn.
8  Q  And what about Danny Lopez, who's that?
9  A  He was another driver who also had to leave.
10 Q  Did he think of you as a leader?
11 A  I don't know.
12 Q  Okay. Can you look at Interrogatory No. 7? Do you
13 see the answer there that you gave that talks about when you
14 exercised your rights your work was closely scrutinized? I'd
15 like you to clarify what you meant by that, 'cause you just
16 told me that it was never closely scrutinized.
17 A  Well, you asked me if I had been -- if I felt that I
18 had been scrutinized and I said no.
19 Q  But here you say that you were.
20 A  Oh, but you asked me if I felt right now if I was
21 being scrutinized, that if I felt closely scrutinized.
22 Q  Did you feel closely scrutinized when you were
23 working there?
24 A  When I was working there, I did feel that they were
25 looking after what I was doing.

Page 61

1  Q  Okay. Who, who did that?
2  A  Well, the same Gonzalez.
3  Q  And when was that?
4  A  (In English) When?
5    (By the Interpreter) He had the custom of when
6 there was a group of us talking, three of us talking, he would
7 go around the bus, and I had the idea that he was trying to
8 figure out what we were talking about.
9  Q  That's eavesdropping. That's being nosy. I'm --
10 I'm talking about closely scrutinizing your work. Did they
11 ever --
12 A  Of what I would do on my job? Like, for example,
13 how I would drive my bus, the maintenance?
14 Q  Your paperwork, how you cleaned the bus,
15 double-checking when you punched in, when you punched out.
16 A  Well, he wouldn't have to look at me to do that.
17 Just by seeing the clock where one punches in and out, that's
18 how they find out. But I do know that they would go and check
19 the busses to see how they were doing, how they were. One day
20 that I went out on a trip I asked him if he could do me the
21 favor of opening up the hood for the bus because it's one of
22 those flat-front busses, and I asked him to open it up from
23 the inside and he said, "No, that's your -- that belongs --
24 that pertains to you. You have to do that job."
25 Q  Was it your job?

Page 62

1    (In English) Yeah.
2    (By the Interpreter) But I couldn't open it. I
3 could no open it because it was hard. In other words, that
4 was not my bus. I'm not used to those type of busses, and I
5 asked him for that favor and he said, "No, that's your
6 business. You have -- you have to check it."
7    Q So, he just didn't help you?
8    A No.
9    Q Okay. Again, I'm trying to find out how your work
10 was scrutinized. Can you -- let me -- let me try it this way.
11 Can you tell me if there's anything Mr. Gonzalez looked at in
12 regards to your work performance that he didn't do to the
13 other people?
14    A Well, to start with, the hours that he wouldn't give
15 me. I had the seniority there and he wouldn't treat me as
16 such.
17    Q Did he ever interfere with your ability to do your
18 job when you were working?
19    A Not that I can remember.
20    Q Did he ever pick on you?
21    A No, no. As far as fighting, telling me something
22 directly, no.
23    Q Did he leave you alone to do your job?
24    A Yes, I would do my job. As far as me doing my job
25 at the bus, he wouldn't intervene.

Page 63

1    Q Were you happy there working?
2    A Well, until he got there.
3    Q And what -- okay. Okay.
4    A Let me explain this to you. Look --
5    Q Go ahead.
6    A During Thanksgiving, we would always do a dinner for
7 all of us.
8    Q Okay.
9    A And during that Thanksgiving, he only wanted to do a
10 dinner for the group of people that he had during the
11 afternoons for pre-K. So, then I told him no. I said, "We do
12 a dinner for everyone here or we don't do a dinner." He got
13 mad, he didn't like that, but he did do the dinner for all.
14 He would do things like that all the time that I didn't like,
15 I didn't see them right.
16    Q And who were those -- who were those drivers in the
17 afternoon that did pre-K?
18    A Well, there were several of them. It must've been
19 eight or ten. I don't remember how many there were.
20    Q Why did he want to do something for them and not
21 everybody?
22    A I don't know. He only wanted a little group, that's
23 all.
24    Q Were they his friends?
25    A Oh, yes.

Page 64

1    Q And you -- can you think of any reason that he would
2 treat them differently than the rest of you?
3    A I don't know. Sometimes I think -- I don't know
4 what to tell you.
5    Q Just what --
6    A He had more relationship, better relationship with
7 them, or these people were always there, those pre-K people
8 that -- that he gave them more hours.
9    Q So, that's the same group we were talking about
10 earlier?
11    A (In English) Yes. Yes, the same group.
12    (By the Interpreter) The same group.
13    Q And that was maybe one to three of them were union
14 members, that group?
15    A Yes, more or less.
16    Q Okay. I want to look at the admissions, the request
17 for admissions. Okay? I want to ask you about September of
18 1989. That was a long time ago. Do you remember being in a
19 bus accident?
20    A No. I've never been in an accident.
21    Q Okay. Do you --
22    MS. BARRERA: I want to have this marked.
23    (Exhibit 4 marked.)
24    Q (Ms. Barrera) I'm going to show you what's been
25 marked as Deposition Exhibit No. 4. This is a memorandum

Page 65

1 about a bus accident that you were involved in. Is that not
2 correct?
3    A No, I've never been in a bus accident.
4    Q Can you tell me where that came from, then?
5    A (In English) I don't know. I don't know.
6    (By the Interpreter) And I have the telephone
7 number for Chuy Sanchez. He was a supervisor. He doesn't
8 have any accident of mine.
9    Q Okay.
10    A Nor did he sign the copy, because there's no
11 accident.
12    Q Okay. So, then, who is -- I don't know how to say
13 his last name -- Vochatzer?
14    A Who?
15    Q The person who sent the memo.
16    A He was somebody who worked there at school, but I
17 don't know.
18    Q Okay. So, you were never suspended?
19    A Never. I never had an accident, thank God.
20    Q Okay. The other thing I want to ask you about, tell
21 me about Rosalinda Rios. Is she a friend of yours or not?
22    A Well, we always treated each other well right there.
23    MS. BARRERA: Okay. May I have this marked?
24    (Exhibit 5 marked.)
25    Q (Ms. Barrera) Have you ever seen this before?

Case 1:01-cv-00095   Document 30   Filed in TXSD on 02/12/2002   Page 27 of 31

Page 66

1    A   Huh-uh.
2    Q   Okay.  And for the record, I'm going to identify
3  Deposition Exhibit No. 5 as a handwritten statement of
4  Rosalinda Rios dated 5/7/98.
5    A  (By the Interpreter)  She's talking about caliche.
6        (In English)  Bus going down to the caliche.  What
7  caliche?  We're going to --
8        (By the Interpreter)  I was on the street and the
9  street doesn't have caliche, because it has that -- what do
10 you call that black thing they put on it?
11       (Exhibits 6 and 7 marked.)
12   Q  (Ms. Barrera)  Have you ever seen what's been marked
13 as Deposition Exhibit No. 6?
14   A   Okay.  First of all, I was only taking Frank
15 Cisneros.  John Randolph was not with me.
16   Q   Have you ever seen that before, Ms. Martinez?
17   A   Not this.  (Witness reads from document in English
18 in sotto voice.)  What is that, a dumpster?
19   Q   I -- I couldn't tell you what he meant.  I can only
20 surmise it's that tool shed.  You know that's the first time
21 I've answered a question in a deposition?
22   A  (Witness reads from document in English in sotto
23 voice.)
24       (By the Interpreter)  To the other seat.
25       (In English)  That's not true.

Page 67

1        (By the Interpreter  )  That's not true.  On the other
2  side there was no glasses.
3    Q   Okay.
4    A  (By the Interpreter)  There was no glass.
5        (In English)  Full speed?  What's full speed?
6        (By the Interpreter)  What's full speed?
7    Q   I don't know.  I -- I'm really just trying to find
8  out if you've ever seen that; and, if not, you can read it and
9  tell me what you think.  I just --
10   A  (Witness reads from document in English in sotto
11 voice.)
12       (By the Interpreter)  Bill Bennett, that's the --
13 that's the -- he was coming with me back here.
14   Q   That was the gentleman you couldn't remember the
15 name?
16   A   Yes, because I didn't know him.
17   Q   Okay.
18   A  (In English)  The bus was on the left lane.  That's
19 not true.
20   Q   Okay.
21   A  (In English)  I was in the right lane.
22   Q   Okay.
23   A  (Witness reads from document in English in sotto
24 voice.)
25       (In English)  What van?  There's no van.  It's a

Page 68

1  truck, a red truck in front of me.
2    Q   Okay.
3    A  (Witness reads from document in English in sotto
4  voice.)
5        MR. PRUNEDA:  Why don't we just go off the
6  record while she reads that?
7        MS. BARRERA:  Sure.
8        (Off the record from 1:00 p.m. to 1:01 p.m.)
9    Q  (Ms. Barrera)  Just so that your deposition is
10 complete, you didn't drive --
11   A   To start off, John Randolph was not with me.
12   Q   Okay.
13   A   Only Cisneros was.
14   Q   Okay.
15   A   Secondly, I wasn't driving 45 miles an hour on my
16 way back.  It was 50 miles.  Thirdly, there was no van.  It
17 was just a little truck --
18   Q   Okay.
19   A   -- and I was in the right lane.
20   Q   Okay.
21   A  (In English)  I was full speed?
22       (By the Interpreter)  I don't know what full speed
23 is here.
24   Q   Okay.
25   A   I don't know what that means.

Page 69

1    Q   Okay.
2    A   That they asked me to bring down the speed and to go
3  back onto the lane, and it says here that "She did not
4  respond."  I told him that I was going to -- that everything
5  was okay, that I was going to go back to my lane.  I'm not in
6  agreement with that letter.
7    Q   Okay.
8        MS. BARRERA:  Okay.  We can go back off the
9  record.
10       (Off the record from 1:03 p.m. to 1:13 p.m.)
11       (Exhibit 8 marked.)
12       MS. BARRERA:  Okay.  I do want to clarify just
13 for the record for housekeeping, Deposition Exhibit No. 5 is a
14 memorandum from Rosalinda Rios, Exhibit No. 6 is a memorandum
15 from the Superintendent Ruiz to -- or from Frank Cisneros to
16 Ruiz, the superintendent, is Deposition Exhibit No. 6.
17 Deposition Exhibit No. 7 is a handwritten statement of Remigio
18 Garza, R-E-M-I-G-I-O Garza.
19   Q  (Ms. Barrera)  I'm sorry that you had to read all of
20 these on the record like that -- or off the record.  All of
21 these have been provided to your attorneys.  So, this -- this
22 isn't like a surprise attack in the middle of the deposition.
23 I don't want you to get that impression.  Okay?
24       I know you don't agree with the version in
25 Exhibit 6, nor Exhibit 5, and I can only surmise you don't

---

Page 70

agree wil .. c. " either. Would you like to comment on No. 7

. . Yes

Q. I want you to feel at liberty to do that.

MR. PRUNEDA: Did I get a copy of these?

MS. BARRERA: Those were in initial disclosures. But if you'd like to go off the record and make a copy, you're more than welcome.

A. One of the things that they're accusing me of was that I was taking pills.

Q. (Ms. Barrera) Okay.

A. It says here that -- he says that I had already taken three pills for the pain, and I was not taking pills.

Q. Okay.

A. That's one thing that they're accusing me of.

Q. Okay.

A. The other one was saying that I was going through the left lane, and then it says here that I was going on the right lane. There's a difference there.

Q. Okay. Swaying?

MS. BARRERA: Let the record reflect she's moving her hands back and forth.

A. I'm sure that I was not doing that.

Q. (Ms. Barrera) Okay.

A. Nor that I had drowsy eyes like it says right back here, that I was falling asleep. It was during the daytime;

---

Page 71

I was not sleepy. What else? Let's see.

Q. And I realize that you're seeing this for the first time, and so you might not be able to tell me everything right now. So, I -- you know, for the record, I know it's not going to be a complete, you know, review.

A. But those are some of the main things.

Q. Okay. This is what's been marked Deposition Exhibit No. 8, and that is your own statement or a translation of your statement. Have you ever seen Deposition Exhibit No. 8 before?

A. This one in English, no.

Q. Okay. Have you had opportunity to see your Spanish statement again?

A. Oh, yes. Yes.

Q. Okay. Would you like to see it just to make sure that those are correct?

(Exhibit 9 marked.)

Q. (Ms. Barrera) Okay. Let me show you what's been marked as Deposition Exhibit No. 9, and this is your handwritten statement; is that correct?

A. Yes.

Q. Okay. For the record, both of those have been turned over, as well, to your attorneys. Okay?

A. I would like to read this to see if it's correct.

Q. Sure. Sure.

---

Page 72

MS. BARRERA: We can go off the record.

(Off the record from 1:18 p.m. to 1:23 p.m.)

Q. (Ms. Barrera) Okay. In regards to Deposition Exhibits No. 8 and No. 9, 9 being your handwritten statement and 8 being the typed statement, were there any mistranslations in there?

A. (By the Interpreter) No, it's right. The only thing would maybe be that it says here that I massaged my neck --

(In English) My neck toward the left, to the left. Okay. Well, I don't know that --

(By the Interpreter) I don't know. What I tried to do here was to straighten out myself right here. I don't know what the difference is. That's all.

Q. Okay. My question is really limited to this paragraph here. You state that you believe he already had it in for you and that you made him apologize. What was that about?

A. In '95, I went with a lot of them to -- it was a band and there was a lot of them, to Lyford, to a game in Lyford, and two of my girls were in the band and there was a fight that broke out between the girls in the band and my two girls, they were fighting. I didn't know anything about it until one of the drivers told me, "Miriam, your girls, they're getting them, taking them out from the band because they were

---

Page 73

fighting." So, I went to talk to Cisneros to see what was happening. The fence was there, the field where the band was playing, and I was over here, and here were -- here's where the stadium seats were at where they were sitting at. So, I asked Cisneros what was happening and he -- he started screaming at me that I didn't know how to control my daughters, I didn't know how to -- how to raise my daughters correctly, and I didn't want to tell him anything because I had the suit on, my uniform on, and I didn't want to fight with him, and I went to the bus to cry.

At that time, Mr. Rocillo was the supervisor, and he told me, "Miriam, don't worry about that. That's gonna get solved. Calm down," and then everything calmed down, and then the following day Mr. Rocillo asked me why didn't I go to talk to the principal at the high school and tell him for this man to give you an apology. I went over there to Mrs. Zamora's office, the principal, and I told her that this Mr. Cisneros owed me an apology because he screamed at me in front of all these people, and she made him come over so that he could apologize to me in front of -- there in the office, and since that day Mr. Cisneros never said "hi" to me as before.

Q. So, you thought he had it in for you because of that?

A. I believe so.

November 30, 2001

---

Page 74

```
1        MS BARRERA: That's all the questions I have.
2              (Time: 1:27 p.m.)
3   BY MR. PRUNEDA:
4        Q  Ms. Martinez, when you say that he had it in for you
5   since then  who were you referring to?
6        A  Who do I refer to?  Cisneros.
7        Q  For the most part, your complaints of retaliation
8   because you've exercised your free speech are based on -- come
9   from who:  from Cisneros or from someone else?
10       MR. PRUNEDA:  No, that's not the way I said it.
11  From Cisneros or from -- or from who else.
12       INTERPRETER:  Oh.
13       A  What I'm doing?  From whom it is?  For Gonzalez,
14  because he's the one that kicked me out of the job.
15       Q  (Mr. Pruneda)  Thank you.  I just have another
16  question and I'll make it quick.  With regard to the incident
17  on the bus during your trip, when you testified here before
18  the jury that you had a sharp, quick pain did you ever take
19  both hands off the wheel or did you make sure that the bus was
20  directed onto the shoulder?
21       A  No, I didn't take both hands off the wheel.  I only
22  took off one and I made sure that the bus would go onto the
23  shoulder.
24       MR. PRUNEDA:  I'll pass the witness.
25             (Time:  1:30 p.m.)
```

Page 75

```
1        MS. BARRERA:  Can you read back the question he
2   asked about someone else, the First Amendment, whatever?
3             (Requested portion was read.)
4   BY MS. BARRERA:
5        Q  Your attorney asked you a question concerning
6   retaliation and free speech and who your complaints come
7   mostly against, and you responded Mr. Gonzalez, correct?
8        A  Uh-huh.
9             (Exhibit 10 marked.)
10       Q  (Ms. Barrera)  Okay.  I'm going to show you what's
11  been marked as Deposition Exhibit No. 10.  Can you tell me
12  what that is, Ms. Martinez?
13       A  Yeah, I read that.  That's -- I read this, but
14  that's what -- that's what Gonzalez put down.
15       Q  Who recommended your termination?
16       A  Gonzalez.
17       Q  Based on what?
18       A  Because he said that I was -- that I was placing the
19  children in harm's way, but he used a word.
20       Q  Carelessness or --
21       A  As like to say that I was dangerous, something like
22  that.  I don't remember the word that he used.
23       Q  And were you aware that the recommendation came from
24  the statements that you read here today from Ms. Rios and
25  Mr. Garza and Mr. Cisneros?
```

Page 76

```
1        A  Well, if Mr. Gonzalez had talked to me, I would've
2   been able to explain to him what happened in the accident.
3        Q  And that's what you did in your grievance process,
4   correct?
5        A  Yes.  The only thing was that these people talked to
6   Gonzalez and I could not talk to Gonzalez because he did not
7   want to talk to me.  So, he heard everything that the rest
8   told him, and on that they fired me.
9        Q  So, he took what he heard from other people and
10  believed it?
11       A  Uh-huh.
12       Q  And that's why he fired you?
13       A  Well, that's what I think, because had he talked to
14  me like he talked to them, I would've explained to him what
15  had happened.  But he did not let me talk to him.
16       Q  Do you --
17       A  So then he heard the rest.
18       Q  Who made the final decision not to give you your job
19  back?
20       A  Fidela Hinojosa.
21       Q  And you said earlier that she never did anything
22  wrong to you, right?
23       A  No.
24       Q  So, whatever Mr. Gonzalez did or did not do to you,
25  she could've given you your job back?
```

Page 77

```
1        A  Well, she could've.
2        Q  Okay.
3        A  Because I never had anything against her and she
4   knew that I had been working there for years and I never had a
5   problem.
6        MS. BARRERA:  Okay.  I don't think I have any
7   more unless I'm going to have more rebuttal questions.
8             (Time:  1:36 p.m.)
9   BY MR. PRUNEDA:
10       Q  Ms. Martinez, did Ms. Hinojosa ever tell you that
11  she knew that you had been writing petitions against the
12  school?
13       A  That if she told me?  No.  She knew that I had done
14  a letter asking for payment or a check that they could bring
15  us at a determined time.  In other words, they went and told
16  -- and told her that I was making a letter for the school.
17       Q  And how did you find this out, Ms. Martinez?
18       A  Because she told me that I was making a letter, that
19  somebody had told her.  So, then I told her, "Yes, I have been
20  making letters, but I've made copies, one -- one copy for you,
21  one for Mr. Ruiz and one for my supervisor," and that's where
22  I gave her the copy.
23       Q  Did this confrontation with Ms. Hinojosa occur
24  before or after --
25       MS. BARRERA:  Objection.  That's a
```

Page 78

mischaracterization of the testimony. She never called it a
confrontation.

Q (Mr. Pruneda ) What would you call it, Ms. Martinez
when you explained the petition to Ms. Hinojosa? Was it a
meeting or was it you just running into her in the hallway?
Could you describe that for the jury?

MS BARRERA: Objection. Mischaracterization
of environment. This is a deposition and neither of us have
admitted this into exhibit for trial. It is not before a
jury. This is in front of a court reporter in an informal
deposition.

Q (Mr. Pruneda ) Ms. Martinez, you stated that you
found out that Ms. Hinojosa had been told that you were
writing letters against the school district?

A Yes.

Q How was it that you discussed this with
Ms. Hinojosa?

A Well, I went to her office to clear up the letter
matter.

Q What letter are we talking about?

A It's a letter that I made so that they could give us
the check at the time that we would get out, because we would
-- we would have to go for it an hour later. So, I made this
letter so that they could give us the check at the same moment
that we would punch out so that the checks would be there

Page 79

ready for us.

Q Who was that letter directed to?

A To the payroll department, where they give the
checks.

Q So, you went to talk to her about a letter, not the
petition?

A No, it's not about the petition. I went to go talk
to her about the fact that they were saying that I was making
letters for -- for a petition for school. I went to go clear
that up, that it wasn't directed at -- at the school.

Q Okay. I'm a little bit confused.

A Let me explain this better. We were receiving
checks late. So, then I made a letter, I handwrote it, and at
one moment when there was supposedly nobody there at the bus
barn, Mr. Basilio Soto came in, our union representative.
Then, I was reading to him the letter to see if it was
well-written. So, then, the bus driver passed by there,
Nestor Hinojosa. So, I finished reading my letter and Soto
told me that it was okay, very well. I typed it and made
copies of it, when Fidela called me and they told her, she
told me, that they were letters, copies against the school.

Q Would you consider this second letter another
petition?

A Well, it was a petition, yes.

Q Who signed this other letter?

Page 80

A Well, no, nobody managed to sign it.

Q Okay. Was there a second petition that was ever
signed by other employees?

A The petition about regarding several items. I don't
remember how many items there were. One was regarding the
hours. One -- another one was another driver, the fact that
she had pre-K at 6 p.m. and other trips that she was getting,
and we were trying for her to not get -- to take away some
trips from her to give them to somebody else.

Q Okay.

A I don't remember all the items. It was like three
sheets.

Q Okay. Thank you. Now, was it after this second
petition that you've just been describing that you called the
media?

A Yes, it was after that. It was Channel 4.

MR. PRUNEDA: Okay. I'll pass the witness.
(Time: 1:44 p.m.)

BY MS. BARRERA:

Q When you went in and talked with Ms. Hinojosa, did
she scream at you?

A Not me.

Q Did she yell at you?

A No.

Q Did she threaten you?

Page 81

A No.

Q Did she tell you, "Stop it. Don't you ever write
any petitions again"?

A No.

Q Did she tell you anything like that?

A No.

Q Did she care that you were writing petitions?

A She didn't tell me anything. She didn't tell me
anything.

MS. BARRERA: Okay. I don't have any more
questions unless I have more rebuttal questions.
(Time: 1:45 p.m.)

BY MR. PRUNEDA:

Q Ms. Martinez, did anybody ever accuse you of making
petitions during working hours?

A Gonzalez. He didn't tell me directly, but, in other
words, the group, the ones -- those of us who worked there and
conversed, they all talk about the things that they hear and
talk about in the office and then they come and they tell --
say it out here. Then, they started to say, "Gonzalez said
that you were starting to take signatures during working
hours." So, then, I told them, "I don't think I'm doing
anything during work hours, because I haven't punched in yet."

Q And who told you this, Ms. Martinez?

A The group that was talking there. I don't know who

Page 82

it was at that moment. I'm going to try to remember to see who it was that talked to me at that moment. I think that it was the same Nila. Yes, I think it was her who told me.

Q Who's Nila?

A Leonila Sanchez.

MR. PRUNEDA: Okay. I'll pass the witness.

(Time: 1:47 p.m.)

BY MS. BARRERA:

Q Did Mr. Gonzalez ever come to you and say, "You've been making copies on our machine"?

A I didn't do anything in school.

Q So, Mr. Gonzalez never came and said anything to you, did he?

A Directly, he never told me anything. Face-to-face, he never told me anything.

Q Did he ever tell you anything face-to-face about any of your union activity?

A No.

Q So, everything you're saying is because you heard it from someone else who heard it from Mr. Gonzalez, correct?

A Well, in reality, yes. In reality, he never told me anything directly. He would never come talk to me directly.

Q Okay.

A Like, for example, that day that he took me out he didn't tell me at the moment, "You're fired." He didn't

Page 83

tell me.

Q Okay. Why not?

A I don't know why he didn't tell it to me face-to-face.

Q Do you think that if he didn't like you he would have taken that opportunity to tell you to your face?

A Well, he could've told it to me. I never treated him wrong or anything. I always respected him, quite to the contrary. And, then, like Laura would tell me, one of the drivers there, after he got me out he went -- he hopped into her bus and asked her, "What do you think about what happened to her?"

Q And, in the end, Mr. Gonzalez didn't fire you, did he?

A (Answer not translated into the record.)

Q Who fired you?

A He told me, "Look, go talk to Fidela." I went to go talk to Fidela, and I don't know if it was hypocrisy or not, but Fidela told me, "Why'd you come here for?" and I told her, "Well, Gonzalez told me to come talk to you." So, then she already had the copy in her hand signed by her and Ruiz, and she said, "And what it says here is that Mr. Gonzalez took you out of the job and he didn't -- he doesn't want you to come back."

Q So, Mr. Gonzalez recommended your termination?

Page 84

A Yes, I suppose so.

Q And Mr. Ruiz and Ms. Hinojosa are the ones with the authority to fire you?

A Hinojosa is the one who has the authority to get in and out, but why did she get me out? In other words, if she knew, like I told her that, you know, I'd been working here for 11 years and I'd never given her a problem, never, them a problem, why now, and she said, "I don't know, because according to what I see here, he doesn't want you to work anymore."

MS. BARRERA: Okay. I don't have any more unless I have more rebuttal questions.

MR. PRUNEDA: I'll reserve any questions.

(Proceedings concluded at 1:51 p.m.)

Page 85

CHANGES AND SIGNATURE

PAGE    LINE    CHANGE              REASON

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____